**Robert E. RANDALL, Petitioner,**

v.

**COMFORT CONTROL, INC. and Liberty Mutual Insurance Company, Respondents.**

**No. 83–1123.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 12, 1983.

Decided Jan. 24, 1984.

---

William F. Mulroney, Washington, D.C., for petitioner.

Donald P. Maiberger, Rockville, Md., for respondents.

Marianne Demetral Smith, Atty. Dept. of Labor, Washington, D.C., entered an appearance for Director, Office of Workers Comp. Programs, United States Dept. of Labor.

Before WRIGHT and EDWARDS, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

Robert E. Randall asks this court to review a decision and order of the Benefits Review Board of the United States Department of Labor (the Board) which upheld a denial of his compensation claim brought under the Longshoremen's and Harbor Workers' Compensation Act (the Act), 33 U.S.C. §§ 901–950 (1976 & Supp. V 1981).[1] Randall claims a permanent partial disability resulting from a back injury sustained in a fall at work. He argues that his wage-earning capacity has been diminished, although his post-injury wages are higher than his previous wages. The Administrative Law Judge (ALJ) denied petitioner's claim, finding that, because petitioner has been able to acquire sheet metal work at wages in excess of his pre-injury wages, his wage-earning capacity has not been impaired. Decision and Order of Administrative Law Judge dated August 8, 1980 (hereinafter ALJ Decision) at 6, Appendix to Petitioner's Brief (App.) 24. The Board, with one judge dissenting, affirmed the ALJ's decision. We find the ALJ's decision not to be supported by substantial evidence on the record as a whole and not otherwise in accordance with law because of the ALJ's failure to consider explicitly all of the requisite factors relevant to the wage-earning capacity issue, and because of his fail-

---

1. The Act's provisions were made applicable to employers in the District of Columbia pursuant to 36 D.C.Code §§ 501–504 (1974 ed.).

ure to account for uncontroverted evidence on the record favoring petitioner. Consequently, we vacate the decisions and orders of the Board and the ALJ, and remand this case for further proceedings not inconsistent with this opinion.

## I. BACKGROUND

### A. *Petitioner's Trade*

Petitioner Randall is a journeyman sheet metal worker. He has been a member of Local 102 of the Sheet Metal Workers' Union since 1970. Shortly after joining the union petitioner began training as an "air balancer," a highly specialized skilled craft within the sheet metal trade. Basic sheet metal work involves the installation of metal ductwork for heating or air conditioning systems, and requires substantial amounts of lifting and carrying of heavy steel sheeting, weighing from 60 to 100 pounds, as well as climbing and bending. Official Report of Proceedings Before the Administrative Law Judge (Record) at 12, 19 (February 19, 1980). Air balancing involves the measuring and adjusting of the air flows in a completed duct system to assure that it conforms to the engineer's designs. Although requiring additional education and training, air balancing requires much less agility and lifting than does regular sheet metal work. The skilled trade of air balancing is so specialized that there are only about 15 to 25 air balancers in the Washington, D.C. area. *Id.* at 23. In contrast, there are approximately 1,100 members of the Sheet Metal Workers' Union Local 102 in the metropolitan area. *Id.* at 99. Respondent Comfort Control, Inc. is one of only two firms that specialize in air balancing and whose air balancing technicians do no general sheet metal work. Elsewhere, firms employ sheet metal workers who do air balancing work in addition to their regular work. *Id.* at 22–24.

### B. *The Accident*

In 1976, while petitioner was working for respondent Comfort Control as an air balancer, he injured his back when he tried to catch a light fixture falling from the ceiling on which he was working. It is undisputed that the injury was work-related. As a result, petitioner's back was operated on and a spinal fusion was performed. As the ALJ concluded, "There is no question * * * that Mr. Randall has suffered a medically disabling injury." ALJ Decision at 4, App. 22. One doctor estimated that Randall had suffered a 40 percent permanent partial disability of the lower back, Randall's physician testified that he had suffered a 17 percent permanent partial disability of the body as a whole, and respondents' physician estimated the disability at 20 percent. *Id.*

### C. *Post-Injury Employment*

Petitioner's post-injury employment record consists of various jobs interspersed with periods of unemployment. Approximately one year after his surgery, petitioner sought to return to his air balancing position with Comfort Control, but was refused employment. He filed a grievance through the mechanisms provided in the collective bargaining agreement. Record at 32 (February 19, 1980). While the grievance was being processed petitioner, unable to find a job in the Washington, D.C. area, went to Detroit to work on the annual remodeling of the automobile plants. *Id.* at 32–33; ALJ Decision at 2, App. 20. Petitioner worked in Detroit for two months with substantial overtime. Record at 35 (February 19, 1980). According to petitioner's unrefuted testimony, the sheet metal work he performed in Detroit is distinguished from normal sheet metal work by two factors: (1) the work was a "time and materials job,"[2] with less pressure to work rapidly, and (2) petitioner testified that his co-workers, knowing of his injury, helped him with the lifting and carrying. *Id.* at 33–34. Petitioner claims that his injury

---

**2.** On "time and materials" jobs contractors are paid on a "cost plus" basis, rather than on the basis of a prior contract bid. Because employ- ers have no bid to meet on time and materials jobs, they do not pressure the workers to produce faster. Record at 33 (Feb. 19, 1980).

would have prevented his working in Detroit were it not for these distinguishing factors.

Upon his return from Detroit petitioner was reinstated in his old position with Comfort Control as a result of the grievance he filed. Three months later he was let go in a general lay-off. All of the employees, except petitioner, were gradually rehired. Record at 60–61 (March 3, 1980). After his termination by Comfort Control, petitioner was unemployed for three months until he found a job in Front Royal, Virginia. That job lasted six weeks. Record at 45–46 (February 19, 1980). Petitioner testified that the job was a time and materials job, and that the foreman knew of his injury and, therefore, required him to do very little physical work. *Id.* at 46.

Immediately upon termination of his employment in Front Royal, petitioner was hired by his present employer, Enterprises Sheet Metal (Enterprises). Petitioner's duties with Enterprises consist of 15 percent air balancing, 65 percent "troughing,"[3] and the remaining 20 percent regular sheet metal work. ALJ Decision at 3, App. 21. When petitioner performs regular sheet metal work his co-workers do the lifting, and, even when he is air balancing, an apprentice hired by Enterprises does the lifting for him. *Id.;* Record at 47–48 (February 19, 1980). Petitioner testified that his employer knows of his back injury and, consequently, assigns him to the lightest work the company has. *Id.* at 47.[4] According to the ALJ's opinion, "Mr. Randall's current employer intends to retire within the year and is uncertain as to whether he will dissolve the business. * * * In light of Mr. Randall's back problems, this may cre-

ate difficulty in finding employment." ALJ Decision at 3, App. 21.

In each of his jobs since the injury petitioner, as a member of the union, has earned wages on the same union wage scale as before the accident. These wages are currently higher than those earned by petitioner at the time of his injury. Record at 54 (February 19, 1980). In rejecting petitioner's claim for permanent partial disability, the ALJ relied primarily on petitioner's continuing ability to obtain work at wage levels higher than he earned at the time of the injury. In this petition we are asked to find that the ALJ's decision is not supported by substantial evidence.

## II. STATUTORY FRAMEWORK

■ In early 1980 petitioner filed a claim for permanent partial disability under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950 (1976 & Supp. V 1981). The Act divides permanent partial disability cases into two groups, according to the type of injury. The first group, scheduled disabilities, are compensable at a specific rate regardless of their economic effect. *See id.* § 908(c)(1)–(20). The second group, unscheduled disabilities, are only legally compensable if they lessen the worker's "wage-earning capacity." *See id.* § 908(c)(21).[5] Petitioner's claim clearly fits within this second category. Hence, his undisputed medical disability is compensable only to the extent that it adversely affects his wage-earning capacity.

The statute provides that, in calculating post-injury wage-earning capacity, actual post-injury wages shall be used if they "fairly and reasonably represent * * * wage-earning capacity"; but if they "do

---

**3.** "Troughing" involves working with aluminum. A 10-foot aluminum strip weighs approximately two pounds, while a 10-foot strip of regular sheet metal weighs 60 to 80 pounds. Record at 47–48 (Feb. 19, 1980).

**4.** Petitioner also testified that approximately 90% of the projects on which he has worked for Enterprises have been time and materials jobs. *Id.* at 49.

**5.** Section 908(c)(21) provides:

> In all other cases in this class of disability the compensation shall be 66⅔ per centum of the difference between [the claimant's] average weekly wages and his wage-earning capacity thereafter in the same employment or otherwise, payable during the continuance of such partial disability, but subject to reconsideration of the degree of such impairment by the [ALJ] on his own motion or upon application of any party in interest.

not fairly and reasonably represent * * * wage-earning capacity," the ALJ is authorized to,

> in the interest of justice, fix such wage-earning capacity as shall be reasonable, having due regard to the nature of [the] injury, the degree of physical impairment, [the claimant's] usual employment, and any other factors or circumstances in the case which may affect [the claimant's] capacity to earn wages in his disabled condition, including the effect of disability as it may naturally extend into the future.

*Id.* § 908(h). The ultimate objective of this wage-earning capacity formula is "to determine the wage that would have been paid in the open labor market under normal employment conditions to claimant as injured. * * * Only by the elimination of all variables except the injury itself can a reasonably accurate estimate be made of the impairment of earning capacity to be attributed to that injury." 2 A. LARSON, THE LAW OF WORKMEN'S COMPENSATION § 57.21, at 10–101 to 10–102 (1982). The mere fact that post-injury wages are equal to, or in excess of, prior earnings is not determinative of the wage-earning capacity issue.[6] However, the Benefits Review Board has held that "the burden of establishing that actual wages do not fairly and reasonably represent the claimant's earning capacity falls upon the claimant, not the employer." *Hughes v. Litton Systems, Inc.,* 6 BEN.REV. BD.SERV. (MB) 301, 305 (1977).

The Act specifically requires that, in determining wage-earning capacity, the ALJ take into consideration "the effect of disability as it may naturally extend into the future." 33 U.S.C. § 908(h). This requirement must be read in conjunction with the Act's statute of limitations provisions to be fully understood. Section 922 of the Act provides:

> Upon his own initiative, or upon the application of any party in interest, on the ground of a change in conditions or because of a mistake in a determination of fact by the [ALJ], the [ALJ] may, at any time prior to one year after the date of the last payment of compensation * * * or at any time prior to one year after the rejection of a claim, review a compensation case * * * and * * * issue a new compensation order which may terminate, continue, reinstate, increase, or decrease such compensation, or award compensation.

*Id.* § 922. *See also id.* § 913(a) (right to compensation barred if claim not filed within one year of injury). The disability award provided for under the Act is designed to compensate claimants for reductions in wage-earning capacity, resulting from the injury, as they may occur throughout the claimant's lifetime. *See* 2 A. LARSON, *supra,* § 57.21, at 10–74 to 10–76. The Benefits Review Board and the courts have mandated this "forward-looking perspective" precisely because of the short statute of limitations. *Hole v. Miami Shipyards Corp.,* 640 F.2d 769, 772 (5th Cir.1981) (Act contains provision granting discretion to set wage-earning capacity, "in the interest of justice," because "Congress realized the potentially harsh effect of this relatively short statute of limitations in a case where a claimant's immediate post-injury earnings are equal to or greater than his earnings prior to his injury"). *See also Hughes v. Litton Systems, Inc., supra,* 6 BEN.REV.BD. SERV. (MB) at 304. This forward-looking perspective is even more critical in cases, such as the one at bar, where the ALJ has rendered a judgment of no disability and, consequently, subsequent modification under Section 922, after the expiration of one year, is not available.

---

6. *See, e.g., Todd Shipyards Corp. v. Allan,* 666 F.2d 399, 402 (9th Cir.) (post-injury wages in excess of prior earnings held not to "fairly represent his wage-earning capacity because his disabilities make it unlikely that he could compete on the open market"), *cert. denied,*

459 U.S. 1034, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982). *See also Travelers Ins. Co. v. McLellan,* 288 F.2d 250, 251 (2d Cir.1961); *Liberty Mutual Ins. Co. v. Britton,* 243 F.2d 659 (D.C. Cir.1957) *(per curiam).*

## III. ANALYSIS

### A. *Standard of Review*

■ This court's role in reviewing decisions of the Benefits Review Board under the Longshoremen's and Harbor Workers' Compensation Act is limited. The decision of the ALJ must be upheld if it is supported by substantial evidence considered on the record as a whole and is otherwise in accordance with law. *See Director, OWCP v. Nat'l Van Lines, Inc.*, 613 F.2d 972, 985 (D.C.Cir.1979), *cert. denied*, 448 U.S. 907, 100 S.Ct. 3049, 65 L.Ed.2d 1136 (1980); *Wheatley v. Adler*, 407 F.2d 307, 310 (D.C. Cir.1968) (*en banc*); *J.V. Vozzolo,. Inc. v. Britton*, 377 F.2d 144, 147 (D.C.Cir.1967). *See also* 33 U.S.C. § 921 (1976 & Supp. V 1981). In performing this review function we must "conduct an independent review of the record to determine if the ALJ's findings are supported by substantial evidence." *Stevenson v. Linens of the Week*, 688 F.2d 93, 97 (D.C.Cir.1982). *See also Januszewicz v. Sun Shipbuilding & Dry Dock Co.*, 677 F.2d 286, 290 (3d Cir.1982); *Avondale Shipyards, Inc. v. Vinson*, 623 F.2d 1117, 1119 n. 1 (5th Cir.1980); *Sun Shipbuilding & Dry Dock Co. v. McCabe*, 593 F.2d 234, 237 (3d Cir.1979). In addition, this court has held that in applying this standard of review "the beneficent purposes and humanitarian nature of the Act must be borne in mind," and that "doubtful questions, including factual ones * * *, must be resolved in favor of claimants." *Hensley v. Washington Metropolitan Area Transit Authority*, 655 F.2d 264, 267 (D.C.Cir.1981), *cert. denied*, 456 U.S. 904, 102 S.Ct. 1749, 72 L.Ed.2d 160 (1982).[7]

### B. *The ALJ's Decision*

■ Applying this standard of review to the ALJ's decision in this case, we find it unsupported by substantial evidence on the record as a whole. We therefore vacate the decision and order of the ALJ, as well as the Board decision and order affirming the ALJ's decision, and remand this action for further proceedings. We express no opinion as to the appropriate ultimate resolution of petitioner's claim—this is a matter for the ALJ in the first instance; we merely hold that the ALJ's current decision and order cannot withstand our statutorily mandated standard of review.[8]

We find two basic inadequacies in the ALJ's decision and order: (1) the failure of the ALJ to consider all of the relevant factors in determining petitioner's post-injury wage-earning capacity, and (2) the ALJ's failure to respond explicitly to uncontroverted evidence in the record in opposition to his finding of no disability. Moreover, these aspects of the ALJ's decision focus on a third, more general, problem: the ALJ's overemphasis on the claimant's current labor market position and the corresponding failure of the ALJ to account for the claimant's uncertain position in future labor markets.

### 1. *Failure to consider all relevant factors.*

The Benefits Review Board has described Section 908(h) of the Act as "mandat[ing] a two-part analysis of the claimant's wage-earning capacity." *Devillier v. Nat'l Steel & Shipbuilding Co.*, 10 BEN.REV.BD.SERV. (MB) 649, 660 (1979). The first inquiry requires the ALJ to determine "whether actual post-injury wages reasonably and fairly represent wage-earning capacity." The second requires the ALJ, after having

---

7. *See also Champion v. S & M Traylor Brothers*, 690 F.2d 285, 287 (D.C.Cir.1982); *Howell v. Einbinder*, 350 F.2d 442, 444 (D.C.Cir.1965) ("substantial evidence rule must be applied with regard also for the rule that '[d]oubts, including the factual, are to be resolved in favor of the employee or his dependent family'") (citation omitted); *Vinson v. Einbinder*, 307 F.2d 387, 388 (D.C.Cir.1962) ("The reviewing court will not sustain the administrative findings merely because they are substantiated by some isolated evidence. Our review must also take account of the settled rule that the Act is to be construed with a view to its beneficent purposes."), *cert. denied*, 372 U.S. 934, 83 S.Ct. 880, 9 L.Ed.2d 765 (1963); *Friend v. Britton*, 220 F.2d 820, 821 (D.C.Cir.), *cert. denied*, 350 U.S. 836, 76 S.Ct. 72, 100 L.Ed. 745 (1955).

8. The ALJ is free to conduct new hearings and to receive new evidence, if he so chooses.

found actual wages unrepresentative, to arrive at a dollar amount which fairly and reasonably represents the claimant's wage-earning capacity. *Id.* Although the second inquiry need not be reached depending on the outcome of the first, the Board has held that the same factors must be considered at each level of the analysis. *Id.* at 660–661. In *Hughes v. Litton Systems, Inc., supra,* 6 BEN.REV.BD.SERV. (MB) 301, the Board set out a non-exclusive list of relevant factors which should be considered in deciding wage-earning capacity:

> The concept of a loss of wage earning capacity encompasses more than a mere comparison of wages before and after an injury. Such factors as the beneficences of a sympathetic employer, the claimant's earning power on the open market, whether the claimant is required to expend more time, effort or expertise to achieve pre-injury production, and whether the claimant can perform his pre-injury physical work must all be taken into consideration. In addition, loss of wage earning capacity is also a forward looking concept which is to be applied in cases where medical and other circumstances indicate a probable work injury related wage loss in the future. The relatively short (one year) statute of limitations requires such a perspective.

*Id.* at 304 (citation omitted). In reversing an ALJ finding of disability in another case for failure to consider explicitly each of the factors listed above, the Board noted:

**9.** Even the ALJ's analysis of the sympathetic employer factor is inadequate. The ALJ discounts the beneficence of petitioner's employer because the employer sought to entice petitioner away from his past employer. The ALJ's analysis evidences a fundamental misunderstanding of the wage-earning capacity determination. The question is one of degree, not of absolutes. The mere fact that petitioner provides valuable services to Enterprises is not conclusive of the sympathetic employer issue. Petitioner's employment need not be a total act of charity. The appropriate comparison is the value of petitioner's services to an employer as injured compared to their value prior to the injury, not whether petitioner's services have any value at all. It is undisputed that the average air balancing technician working for a

When an administrative law judge is setting forth in a Decision and Order his or her analysis of whether post-injury earnings fairly represent the claimant's wage-earning capacity and, if necessary, fixing a reasonable wage-earning capacity, Section 8(b) of the Administrative Procedure Act, 5 U.S.C. § 557(c), requires that he or she make *explicit findings on all relevant aspects of the determination.* * * * [W]e are not holding that the variables listed in this decision form an exhaustive list. We will not foreclose the ingenuity of counsel by pretending that every conceivable fact situation is encompassed in these factors. However, whether the listed variables or any other reasonable variables form the basis of a Decision and Order, that Decision and Order *must explicitly state* what considerations prompted the administrative law judge to hold as he or she did.

*Devillier v. Nat'l Steel & Shipbuilding Co., supra,* 10 BEN.REV.BD.SERV. (MB) at 661 (emphasis added; citations omitted).

The ALJ decision and order which is the subject of review in this case contains no such explicit findings. Although the decision does cite to the factors listed by the Board in *Hughes, see* ALJ Decision at 5, App. 23, the opinion contains no discussion of any of the factors other than the sympathetic employer factor. *Id.* at 5–6, App. 23–24.[9] Rather, the opinion focuses entirely on the fact that petitioner has been able to secure employment at wages in excess of his pre-injury wages. *Id.* at 6, App. 24.[10]

firm like Enterprises is expected to be able to perform normal sheet metal work. It is likewise undisputed that petitioner performs sheet metal work only with the aid of his fellow employees, and that petitioner is given the lightest work available.

**10.** As noted above, the higher post-injury wages earned by petitioner are the result of increases in the union wage rate for sheet metal workers. The wages received by a particular employee as a result of union bargaining for industry-wide pay rates are not indicative of the employee's true wage-earning capacity. *See Travelers Ins. Co. v. McLellan, supra* note 6, 288 F.2d at 251–252; *Liberty Mutual Ins. Co. v. Britton, supra* note 6, 243 F.2d at 659 n. 2. Decreased wage-earning capacity in unionized

Initial determinations on these factors must be made by the ALJ. *See Devillier, supra,* 10 BEN.REV.BD.SERV. (MB) at 661. We remand the case so that the statutorily mandated determinations can be made.

### 2. *Failure to respond to uncontroverted evidence.*

The ALJ's failure to consider all of the relevant factors is exacerbated by the fact that the record contains uncontroverted evidence in petitioner's favor relevant to the wage-earning capacity issue. Although administrative law judges are not bound by uncontroverted testimony on the record, it is generally understood that an ALJ must "expressly state clear and convincing reasons" for rejecting the uncontroverted evidence. *Day v. Weinberger,* 522 F.2d 1154, 1156 (9th Cir.1975). *See also NLRB v. Cutting, Inc.,* 701 F.2d 659, 663, 668 (7th Cir. 1983) (ALJ finding in opposition to uncontroverted testimony is "not entitled to the ordinary presumption of correctness" and may be upheld only "if the ALJ provides good reasons for rejecting the testimony and fully explains those reasons in light of the evidence." "In light of * * * the ALJ's failure to account for all the relevant evidence, we cannot conclude that his findings were based on evidence such 'as a reasonable mind might accept as adequate to support a conclusion.'") (citations omitted); *Midwest Stock Exchange, Inc. v. NLRB,* 635 F.2d 1255, 1261 (7th Cir.1980); *White Glove Building Maintenance, Inc. v. Brennan,* 518 F.2d 1271, 1276 (9th Cir.1975). The ALJ's opinion contains no justification for ignoring the uncontroverted testimony presented by petitioner. In fact, the ALJ included several of petitioner's uncontroverted claims in the statement of facts contained in the decision and order, only to ignore them upon rendering a decision.[11] *See, e.g., Director, OWCP v. Nat'l Van*

*Lines, Inc., supra,* 613 F.2d at 985 (deference to Benefits Review Board decision made difficult "by the failure of the Board to explain how its conclusion follows from its statement of the facts").

The record contains uncontroverted evidence, including testimony from respondents' expert witness, that persons suffering petitioner's injury should not lift more than 30 to 40 pounds. Record at 88 (March 3, 1980). Yet normal sheet metal work requires sustained lifting of 60 to 80 pounds. *Id.* at 19 (February 19, 1980). The record also contains the uncontroverted testimony of petitioner that the jobs he has worked on since his injury were time and materials jobs, that his employers have given him light work, and that his fellow employees have helped him. *Id.* at 33, 34, 36, 47–49. None of this evidence is discounted in the ALJ's opinion. The ALJ appears to consider the evidence irrelevant, finding that "claimant's ability to obtain work which involves sheet metal work other than air balancing belies his claim that such work is unavailable." ALJ Decision at 6, App. 24. Implicit in the ALJ's reasoning is an assumption that the diminution of petitioner's ability to perform his pre-injury employment must reach an undefined level of significance before it is compensable. Otherwise there would be no justification for ignoring the uncontroverted evidence of petitioner's inability to perform as he did before the injury—*e.g.,* ability to lift sheet metal without the aid of co-workers. This implicit threshold imposed in the ALJ's analysis is inconsistent with the Act. Under the Act any reduction in wage-earning capacity greater than zero is compensable. This is evidenced by the Act's focus on the employee's efforts rather than on the wages earned. The Benefits Review Board has held that "a claimant who is able to earn wages after injury comparable to pre-injury

---

industries may be more accurately reflected by difficulty in obtaining employment—*i.e.,* longer interim periods of unemployment—than by wages received. *See* Record at 55 (Feb. 19, 1980); 2 A. LARSON, THE LAW OF WORKMEN'S COMPENSATION § 57.63, at 10–164.135 to 10–164.137 (1982).

11. For example, the ALJ's decision and order acknowledges the fact that petitioner's co-workers do the lifting for him, ALJ Decision at 2–3, App. 20–21, and that petitioner's future employment prospects are uncertain. *Id.* at 3, App. 21.

earnings only by expending more time and effort should be compensated." *Devillier v. Nat'l Steel & Shipbuilding Co., supra,* 10 BEN.REV.BD.SERV. (MB) at 658. Similarly, petitioner's uncontroverted testimony that he is unable to work as quickly now as before the accident, and that he requires the help of co-workers to do what he could do by himself before, appears to satisfy this "increased effort" test in the absence of some justification for discounting petitioner's testimony.

The Act's focus on *any* reduction in wage-earning capacity is also evidenced by its emphasis on "probable work injury related wage loss in the future." *Hughes v. Litton Systems, Inc., supra,* 6 BEN.REV.BD.SERV. (MB) at 304. As noted above, the Act is designed to compensate for any injury-related reduction in wage-earning capacity through the claimant's lifetime. *See* 2 A. LARSON, *supra,* § 57.21, at 10–74 to 10–76. This reduction in lifetime earnings can be caused by longer interim periods of unemployment resulting from the relative undesirability of hiring a disabled worker as well as by the lower hourly wage rate that a disabled employee might receive in a perfectly competitive labor market. The ALJ's opinion gives inadequate treatment to uncontroverted facts on the record which suggest that petitioner may suffer such wage loss. The ALJ simply stated "that [petitioner] is perfectly capable of performing as an air balancing specialist." ALJ Decision at 5, App. 23. However, this finding overlooks the realities of the sheet metal trade. The record establishes that there are only 15 to 25 positions for air balancing specialists in the Washington, D.C. area, Record at 23 (February 19, 1980), while there are approximately 1,100 union sheet metal workers. *Id.* at 99. The number of air balancing positions available to petitioner as an injured air balancer is further diminished by the fact that only approximately 15 of these specialist positions require no sheet metal work. *Id.* at 23. In addition, the record indicates that the vast majority of these "pure" air balancing positions are available with two major companies, of which respondent Comfort Control is one.

*Id.* at 22–24. Comfort Control has already indicated its unwillingness to hire petitioner. Therefore, petitioner's potential job market in the metropolitan area appears to consist of approximately eight positions, while prior to his injury he was apparently able to compete for any available sheet metal position open to the 1,100 union members. This reduction in available jobs by itself justifies an inference that petitioner is likely to spend more time unemployed than he would if he were not injured.

3. *Failure to account for petitioner's uncertain future position in the labor market.*

In vacating the ALJ's decision and order, and remanding this matter for further proceedings, we recognize the onerous burden placed upon the ALJ by the Act. The Act requires omniscience. The ALJ must divine whether the claimant will suffer any injury-related reduction in wage-earning capacity at any time during his lifetime. Often, as in this case, the ALJ will be asked to make this determination at a time when the existence and degree of any reduction in earning capacity is not evidenced by a tangible reduction in current wages paid. This is particularly the case in unionized industries. In vacating the decisions of the ALJ and the Board, we express no opinion on the proper outcome of this case on remand. We merely hold that when confronted with a case of admitted work-related medical disability and uncontroverted evidence indicating a reduction in a claimant's ability to perform at his pre-injury level, an ALJ must consider and make explicit findings on all relevant factors in the wage-earning capacity formula, and may issue a decision in opposition to uncontroverted evidence on the record only after expressly providing good reasons for rejecting that evidence.

We have noted that the Act requires compensation for any reduction in wage-earning capacity, not just reduction over a specified, or significant, threshold amount. However, as the question of disability is one of degree, so is the amount of recovery.

The ALJ is directed by the Act not only to determine the existence of a disability, but also to determine the extent of that disability and to specify the amount of recovery needed to make the claimant whole. Unfortunately, disability is not so easily measured, particularly at the time the claim is filed. Often there may be substantial evidence to support a determination that the claimant has suffered, or will suffer, some injury-related economic harm, but there may be insufficient evidence to allow the ALJ to make a reasonable assessment of the precise degree of that harm. In such circumstances, we adopt the approach of the United States Court of Appeals for the Fifth Circuit in *Hole v. Miami Shipyards Corp., supra,* 640 F.2d 769.

In *Hole* the Fifth Circuit reversed a decision of the Benefits Review Board and reinstated a decision and order of the ALJ. The ALJ, finding "that the precise degree of impairment of [the claimant's] earning capacity could not be determined" at the time the claim was filed, *id.* at 771,[12] awarded a claimant compensation for a one percent permanent partial disability. Noting concern for the Act's short statute of limitations, *id.* at 773, the ALJ arrived at the one percent figure "in order to 'keep[ ] the case alive for purposes of sensible modification of the Order if and when demonstrable change occurs in [the claimant's] earning power.' " *Id.* at 771 (citation omitted). The Board reversed the ALJ's award as "speculative" and "impermissibly influenced by his concern for the short statute of limitations." *Id.* at 773. The Fifth Circuit reinstated the ALJ's decision and held that the *de minimis* award was an appropriate response to uncertainty over the degree of reduction in wage-earning capacity. *Id.* The court recognized that:

> [I]t will often be impossible at the time a claim is filed to determine the precise degree of economic harm suffered by a claimant. Therefore, 33 U.S.C. § 922 provides that an award of compensation may be modified at any time within one

year after the last payment of compensation. * * * Thus, if an initial determination is made that a claimant has suffered some degree of economic harm, however slight, and circumstances later develop indicating that the claimant was harmed to a greater or lesser degree than was originally apparent, the compensation award may be modified years later to reflect this greater or lesser economic injury.

> An initial finding of no economic disability, however, may only be modified within one year of such finding, even though subsequent events make it apparent that the claimant has suffered severe economic harm. * * *

*Id.* at 772. When it is clear that a claimant has suffered a medical disability and there is a significant possibility that the claimant will at some future time suffer economic harm as a result of his injury, but present circumstances make the extent of the economic injury unknowable, the beneficent purposes of the Act and the mandate that due concern be given to "the effect of disability as it may naturally extend into the future," 33 U.S.C. § 908(h), are furthered by granting "[a] small award, fashioned expressly for the purpose of preserving [a] [c]laimant's right to receive compensation should disability in an economic sense ever visit him." *Hole v. Miami Shipyards Corp., supra,* 640 F.2d at 773. We leave the determination of whether there is sufficient uncertainty concerning the extent, if any, of petitioner's economic harm to warrant such a *de minimis* award in this case to the ALJ in the first instance.

IV. CONCLUSION

For the reasons stated in this opinion the order of the Benefits Review Board is

*Vacated and remanded.*

---

**12.** As in this case, the claimant in *Hole* was earning more at the time of the filing of the claim than he was prior to his injury. Similar-

ly, the permanence of his current employment was in doubt. 640 F.2d at 771.