**MARINE POWER & EQUIPMENT; Industrial Indemnity Company, Petitioners,**

v.

**DEPARTMENT OF LABOR; Benefits Review Board; Johnny Quan, Respondents.**

No. 98–70049.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 13, 1999

Filed Jan. 31, 2000

Russell A. Metz (argued), Metz & Associates, Seattle, Washington, for the petitioners.

Marvin Krislov, Carol A. De Deo, Janet R. Dunlop, Laura J. Stomski, Kristin Dadey (argued), United States Department of Labor, Washington, D.C., for the respondents.

Before: CANBY, BRUNETTI, and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must decide whether an employer is eligible for second-injury reduction in liability for benefits payable for a worker's permanent partial disability that may be substantially and materially greater as a result of his preexisting medical condition.

I

Marine Power & Equipment and Industrial Indemnity Company ("Marine Power") hired Johnny Quan in 1978 as a ship scaler, and on June 7, 1983, he injured his right shoulder on the job. Prior to his work for Marine Power, Quan—a native of Guam—served as an airplane mechanic for the United States Navy from 1955 to 1970.

In 1968, he developed Bell's palsy, which resulted in the partial paralysis of the right side of his face. Quan's palsy rendered him unable to close his right eye completely and caused him occasionally to drool. These symptoms, in turn, triggered a depressive reaction and restricted Quan to jobs that involved limited contact with the public because of his concern with his facial paralysis. A report by a Navy adjudicator in 1970 noted that Quan's condition had resulted in "a diminution of those characteristics which make a desirable employee, such as aggressiveness, desire to excel, or initiative, not to mention the physical impairment which precludes his engaging in many types of employment." In 1974, the Veterans Administration awarded Quan a forty percent disability.

After he retired from the Navy in 1970, Quan worked for the next several years in positions that did not require public contact—such as assembly line worker, housekeeper, custodian, dishwasher, and delivery truck driver—until he joined Marine Power in 1978. After he injured his shoulder while ship scaling at Marine Power in June 1983, he worked light duty until he was laid off in August 1984. Quan underwent surgery to repair his rotator cuff in May 1985, and by May 7, 1986, he had reached maximum medical improvement with respect to the industrial injury. As a consequence of his shoulder injury, work as a ship scaler was thereafter beyond Quan's physical capabilities. Quan was not able to secure work again until February 14, 1988, when he obtained a part-time job as a security guard on weekends.

On November 9, 1983, Quan filed a claim for compensation benefits under the Longshore and Harbor Workers Compensation Act, 33 U.S.C. § 901 et seq., (the "Act") against Marine Power. To establish that Quan was not totally disabled following his 1983 shoulder injury, Marine Power submitted two labor market surveys, one conducted in 1986, and the other in 1991. Marine Power's vocational consultant, L. Kent Shafer, completed the first labor market survey in December 1986, identifying six positions that were suitable for

Quan given his age, education, work history, and functional capacities. Quan's treating physician approved five of the six positions.

Shafer completed the second labor market survey in May 1991 in which he took into consideration additional medical information related to Quan's preexisting Bell's palsy and associated depressive condition that had been developed since his first contact with Quan. In this survey, Shafer ruled out two of the 1986 jobs as improbable and identified six other job openings that were suitable. Shafer also noted that Quan should avoid dusty or windy work environments because of his inability to close his eye resulting, of course, from his Bell's palsy. According to Shafer, Quan's work history supported the conclusion that this particular problem limited Quan's work options and affected his ability to compete for jobs.

In his December 9, 1991 Decision and Order Awarding Benefits, Administrative Law Judge ("ALJ") Steven E. Halpern awarded Quan permanent partial disability ("PPD") compensation beginning on February 14, 1988. Moreover, ALJ Halpern concluded that Marine Power was entitled to second-injury relief under 33 U.S.C. § 908(f) (" § 8(f)"), thus reducing Marine Power's liability for payments due under Quan's PPD award to 104 weeks. On appeal by the Director, the Benefits Review Board vacated ALJ Halpern's grant of § 8(f) relief. The Board held that the vocational evidence supported the conclusion that Quan's Bell's palsy and depression limited Quan's opportunities for suitable employment, but that ALJ Halpern had not clearly delineated whether the ultimate PPD was materially and substantially greater than it would have been from his shoulder injury alone.

On remand, ALJ Frederick D. Neusner reconsidered the jobs in Shafer's 1986 and 1991 labor market surveys. Using wage-rate comparisons to determine whether the element of "materially and substantially greater" contribution had been met,

ALJ Neusner denied the § 8(f) relief, finding that Quan's palsy did not affect his wage-earning capacity following his shoulder injury. On appeal by Marine Power from this second ruling by an ALJ, the Board affirmed the denial of § 8(f) relief on November 21, 1997, finding ALJ Neusner's decision in accordance with the Board's remand instructions and supported by substantial evidence.

This petition for judicial review followed.

## II

We review the Board's decision for substantial evidence and errors of law. *See Alcala v. Director, OWCP,* 141 F.3d 942, 944 (9th Cir.1998). The Board must accept the ALJ's findings of fact unless they are contrary to law, irrational, or unsupported by substantial evidence in the record considered as a whole. *See Kashuba v. Legion Ins. Co.,* 139 F.3d 1273, 1275 (9th Cir.1998), *cert. denied,* 525 U.S. 1102, 119 S.Ct. 866, 142 L.Ed.2d 768 (1999). Thus, we must conduct an independent review of the administrative record to determine whether the Board adhered to its standard of review. *See Container Stevedoring Co. v. Director, OWCP,* 935 F.2d 1544, 1546 (9th Cir.1991). A decision is supported by substantial evidence if there exists "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *E.P. Paup Co. v. Director, OWCP,* 999 F.2d 1341, 1353 (9th Cir.1993) (quoting *Lockheed Shipbuilding v. Director, OWCP,* 951 F.2d 1143, 1145 (9th Cir.1991)).

## III

Under the aggravation rule of the Longshore and Harbor Workers' Compensation Act, when an already partially disabled worker suffers an employment injury, the employer is liable for the worker's total resulting disability, including any disability also caused by the previous condition.

In § 8(f), however, the Act provides relief from this rule:

Compensation for disability shall be paid to the employee as follows:

(f) Injury increasing disability:

(1).... In all other cases in which the employee has a permanent partial disability, *found not to be due solely to that injury,* and such disability is *materially and substantially greater than that which would have resulted from the subsequent injury alone,* the employer shall provide in addition to compensation under subsections (b) and (e) of this section, compensation for one hundred and four weeks only.

33 U.S.C. § 908(f) (emphases added). To qualify for § 8(f) relief, the employer bears the burden of establishing that (1) the claimant had an existing permanent partial disability prior to the employment injury, (2) the disability was manifest to the employer prior to the employment injury, and (3) the current disability is not due solely to the most recent injury. *See Director, OWCP v. Cargill, Inc.,* 709 F.2d 616, 619 (9th Cir.1983). That is, that the current disability must be materially and substantially greater *because of the pre-existing condition* than it would be from the employment injury alone. *See* 33 U.S.C. § 908(f). In this case, there is no dispute that the first two elements are satisfied. The only issues before us are whether Marine Power established that Quan's current disability is materially and substantially greater because of his Bell's palsy than it would have been as a result of the shoulder injury alone, and whether the ALJ who made that determination should have considered more than just the possible wages that Quan was able to obtain after his injury.

## IV

Marine Power asserts that ALJ Neusner and the Board erred in refusing to consider Quan's inability to compete in the open market due to his Bell's palsy. Marine Power argues that Quan's pre-existing Bell's palsy *combined with* his shoulder injury foreclosed Quan from some types of employment that he could otherwise perform had he suffered only the shoulder injury, even though it may not have affected the wages he could earn at the jobs that have been identified as appropriate for him. Thus, concludes Marine Power, Quan's ultimate PPD is materially and substantially greater in the economic sense due to the palsy, and Marine Power is entitled to second-injury relief.

We disagree. The Act itself requires a comparison of wage rates if actual earnings fairly represent the worker's earning capacity. The contribution requirement, therefore, dictates that the ALJ determine the employer's current compensation liability, though in appropriate cases there may be some value in looking at the range of jobs available to the disabled worker. Under this analysis, we conclude that Marine Power has not met its burden of showing that Quan was precluded by his Bell's palsy from employment that would not also have been precluded by his shoulder injury.

Section 8(h) states:

The wage-earning capacity of an injured employee in cases of partial disability ... shall be determined by his actual earnings if such actual earnings fairly and reasonably represent his wage-earning capacity: Provided, however, That if the employee has no actual earnings or his actual earnings do not fairly and reasonably represent his wage-earning capacity, the deputy commissioner may, in the interest of justice, fix such wage-earning capacity as shall be reasonable, having due regard to the nature of his injury, the degree of physical impairment, his usual employment, and any other factors or circumstances in the case which may affect his capacity to earn wages in his disabled condition, including the effect of disability as it may naturally extend into the future.

33 U.S.C. § 908(h). Wages alone may not always represent a worker's actual wage-earning capacity. An ALJ may thus need to consider alternative factors when, for instance, a disabled worker is spared demanding physical exertion by the kindness of his employer or coworkers in shielding him from such work on the job, *see LaFaille v. Benefits Review Board, U.S. Dept. of Labor,* 884 F.2d 54, 62 (2d Cir.1989); or if a worker must spend greater time and effort to achieve his pre-injury production, or medical or other circumstances indicate probable future wage loss due to injury, *see Container Stevedoring Co.,* 935 F.2d at 1550. In each of these situations, the fact that a worker earns as much or more after his injury does not accurately reflect his reduction in wage-earning capacity in the current or probable future labor market. Marine Power has not suggested that Quan's condition will deteriorate in the future, that he has a sympathetic employer and coworkers who enable him to work when otherwise he would not be able to, or that any other factor affecting his current wage-earning capacity would not be valid in the future.

Marine Power relies on *Randall v. Comfort Control, Inc.,* 725 F.2d 791, 799 (D.C.Cir.1984), for its assertion that limited opportunities for employment should be considered in determining Quan's wage-earning capacity. The D.C. Circuit held in *Randall* that a limit on employment opportunities "justifies an inference that [the worker] is likely to spend more time unemployed than he would if he were not injured." *Id.* While we agree that we are not always restricted to considering only the wages that Quan could obtain after his injury, this case is not governed by such extraneous considerations. *Randall* is distinguishable. In *Randall,* the injured worker had held a highly skilled job in the sheet metal trade as an air balancing specialist. *See id.* at 793. In that skilled position, the worker was not required to do any actual sheet metal work, which would have involved heavy lifting beyond his physical capacities. *See id.* There were only fifteen such positions in only two companies in the worker's area that did not require actual heavy sheet metal work, and one of those two companies had already stated that it would not hire the worker. *See id.* Thus, the worker in *Randall* was limited to eight potential positions, while prior to his injury he could compete for any sheet metal job in the area. Here, there was no such showing. Quan has no highly specialized skill. On the contrary, he was qualified only for unskilled work both before his shoulder injury and afterward. Marine Power has not shown that there is a limited number of unskilled positions in Quan's area for which he is qualified. Furthermore, Marine Power has not substantiated that any limit on employment opportunities caused by Quan's preexisting Bell's palsy would measurably affect the number of jobs available to him in such a way as to make it probable that he would spend more time unemployed as a result. Here, therefore, the Board properly required the ALJ to use wage rates to determine whether the contribution element was met.

V

As for determining contribution, the Board properly articulated the Ninth Circuit's standard, set out in *Sproull v. Director, OWCP,* 86 F.3d 895, 900 (9th Cir. 1996), that the contribution be material and substantial. Marine Power offers no legal argument to support its assertion that the standard must be precisely defined to be properly applied, and no such precision is required.

■ Contrary to Marine Power's assertion that it met the contribution requirement, both Quan's most recent psychological evaluation and his own testimony indicated that neither his palsy nor his depression would impair his ability to find a job. In fact, immediately after his separation from the Navy, Quan worked serving customers at a steam table and drove a truck de-

livering meals despite his facial paralysis. Further, it is irrelevant that Quan was forty percent disabled when he started work at Marine Power. The issue is whether the palsy and related depression contributed to his ultimate disability after his shoulder injury. As we have already noted, it does not appear that any limit on Quan's wage-earning capacity resulting from his palsy was substantially and materially greater than the limit resulting from his shoulder injury.

Marine Power also contends that it satisfied the contribution element by identifying three jobs that Quan would be able to perform with only his shoulder injury, but that he could not perform because of his Bell's palsy. The ALJ explicitly rejected Shafer's expert testimony on this element, however, stating that it

> is offset ... by the credible testimony of Ms. Bertino, Claimant's vocational counselor, who stated (1) that Claimant was in the lower ten percent of the population in general aptitude, eye/hand coordination and form perception and (2) that the Claimant was below average in spatial perception and manual dexterity. After carefully weighing Ms. Bertino's testimony, I doubt that the Claimant was able to perform the driver or parking attendant positions after suffering his shoulder injury, which materially impaired his eye/hand coordination and manual dexterity.
>
> Based on this evidence of record, Claimant's incapacity to perform the work of a delivery driver and parking attendant had resulted in part from both his pre-existing impairments and the disability caused by his shoulder injury. For these reasons the Claimant cannot be found to have suffered any further loss of earning potential ... solely as a consequence of his pre-existing ... Bell's palsy and depression.

The ALJ's finding was clearly supported by substantial evidence.

Marine Power's witness testified that he did not actually test Quan in 1986 or 1991 for dexterity, but that General Aptitude Test Battery ("GATB") scores indicating low manual dexterity and eye/hand coordination were known to be very unreliable, and Quan had successfully demonstrated sufficient manual dexterity in his jobs as a dishwasher, aircraft mechanic, and ship scaler to support Shafer's contention that Quan could perform these three jobs. Ms. Bertino, on the other hand, worked directly with Quan from his referral in April 1987 approximately until his discharge from outpatient services on January 1, 1988 and participated extensively in his pain and vocational rehabilitation. Her involvement with him included GATB testing and referral to a pain clinic, psychological counseling, physical therapy, occupational therapy, and vocational assistance. She directly administered the testing and supervised the entire progress of his case. She reported detailed findings and interpretations of his GATB test and related them to Quan's personal and individual abilities. The ALJ was perfectly justified in giving weight to both experts' testimony and finding that the jobs were not suitable due to both conditions. The Board, therefore, did not err in accepting the ALJ's conclusion that the three jobs were unsuitable, but not substantially and materially due to his palsy alone.

## VI

For the foregoing reasons, we conclude that substantial evidence supports ALJ Neusner's conclusion, and the Board's subsequent affirmance, that Marine Power does not qualify for § 8(f) relief because Quan's current disability is not substantially and materially greater as a result of his preexisting palsy.

AFFIRMED.