Parker JOHNSTON, Petitioner,

v.

DIRECTOR, Office of Workers Compensation Programs; Matson Terminals, Inc., Self–Insured Employer, Respondents.

No. 01–70201.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 8, 2001.

Filed Feb. 22, 2002.

Mary Alice Theiler, Theiler, Douglas, Drachler & McKee, LLP, Seattle, WA, for the petitioner.

John P. Hayes (argued) and Brent T. Caldwell, Forsberg & Umlauf, P.S., Seattle, WA, for the respondents.

Before: B. FLETCHER, McKEOWN, and TALLMAN, Circuit Judges.

McKEOWN, Circuit Judge.

This case requires us to interpret § 8(c)(21) of the Longshore and Harbor Workers Compensation Act, 33 U.S.C. § 901, *et seq.* Specifically, we consider whether, in a situation where actual wages have remained constant, a claimant's post-injury earnings must be adjusted for inflation in order to be considered on equal footing with wages at the time of injury. Based on our reading of the statute, we hold that under such circumstances, the actual wages—without adjustment for inflation—"fairly and reasonably represent[the claimant's] wage-earning capacity" as required by the Longshore Act. 33 U.S.C. § 908(h). We agree with the Benefits Review Board that "the fact that the wages claimant earned in his post-injury job may not have kept pace with inflation is not due in any part to claimant's injury." We have jurisdiction pursuant to 28 U.S.C. § 2342, and we deny Johnston's petition for review of the Board's decision.

## BACKGROUND

The facts of this case are undisputed. Parker Johnston, a life-long longshoreman, suffered a work-related back injury in November of 1993. Up to that point, he had been working full time as a dock supervisor. In June 1995, Johnston returned to the same job at the same rate of pay, but he was only capable of working part-time because of pain related to his injury.

In February 1996, Johnston stopped working completely and underwent back surgery. He never returned to his job, and his employer, Matson Terminals, voluntarily began to pay him full disability benefits. Despite this arrangement, Johnston chose to retire in October 1996, thus becoming eligible to receive his pension. Matson terminated its voluntary disability disbursements upon Johnston's retirement. Johnston now seeks an award of permanent partial disability payments under the Longshore Act for the period subsequent to Matson's termination of disability compensation.

At the initial hearing, an administrative law judge concluded that Johnston was entitled to permanent partial disability payments under § 8(c)(21) of the Longshore Act. The ALJ calculated the amount of the award by comparing Johnston's average weekly wages as a full-time dock supervisor prior to the injury with his actual, post-injury earnings obtained while working at the same job for Matson part-time between June 1995 and February 1996.

The Benefits Review Board upheld the award of benefits, but remanded to the ALJ solely to determine whether Johnston's post-injury earning capacity was correctly calculated. Specifically, the Board asked the ALJ to consider whether Johnston's actual post-injury wages should be adjusted for inflation.

On remand, the ALJ concluded that Johnston's actual part-time wages accurately reflected his residual earning capacity, and declined to adjust this figure for inflation between the time of his injury in 1993 and the post-injury period during which he worked. Here, Johnston resumed the same job he had prior to the injury, albeit in a part-time capacity. As a result of a collective bargaining agreement in effect between 1993 and 1996, Johnston's wage rate as a dock supervisor remained unchanged between the time of Johnston's injury and the period during which he worked part-time. Because Johnston's post injury wages were earned at

the same rate they would have been at the time of injury, the ALJ concluded that an inflationary adjustment was unnecessary.

On appeal, the Board affirmed the ALJ, and Johnston now petitions for review, challenging solely whether the Board erred in not adjusting his post-injury wages to account for inflation.

## DISCUSSION

We review the Board's decision for errors of law and adherence to the substantial evidence standard. *Marine Power & Equip. v. Dep't of Labor*, 203 F.3d 664, 667 (9th Cir.2000). Because the Board is not a policymaking agency, we give no special deference to its interpretation of the Longshore Act. *Port of Portland v. Director, OWCP*, 932 F.2d 836, 838 (9th Cir.1991). Here, the Board remanded to the ALJ for a determination of whether the circumstances of Johnston's case warranted an inflationary adjustment to his compensation award. We conclude that substantial evidence supports the ALJ's decision that an inflationary adjustment was unnecessary under the circumstances, and we agree with the Board that the Act does not otherwise compel such an adjustment.

## I. Statutory Framework

"The fundamental purpose of the[Longshore Act] is to compensate employees ... for wage-earning capacity lost because of injury." *Metro. Stevedore Co. v. Rambo*, 515 U.S. 291, 298, 115 S.Ct. 2144, 132 L.Ed.2d 226 (1995). For a specified list of injuries, such as loss of a limb, that result in a permanent, but partial disability, § 8(c) provides a neat and rela-

tively undisputable calculus for assessing lost earning capacity: a predetermined number of weeks' compensation based on two-thirds of the claimant's average weekly wages prior to the injury. *See* 33 U.S.C. § 908(c)(1)-(20). For all other, non-scheduled permanent partial disabilities, compensation awards are governed by § 8(c)(21). *See* 33 U.S.C. § 908(c)(21). Because Johnston's back injury does not fall within the list of specified injuries contemplated in § 8(c)(1)-(20), his compensation award must be determined pursuant to the formula provided by § 8(c)(21).[1]

More so than its counterparts for scheduled injuries which operate upon a conclusive presumption of lost earning capacity, *see Rambo*, 515 U.S. at 296, 115 S.Ct. 2144 § 8(c)(21) contemplates a more nuanced compensation formula based on the claimant's actual wage-earning capacity after the injury. This calculation, however, is not without its own limitations.

Section 8(c)(21) requires us to ascertain two figures in order to arrive at a compensation award. The first figure—the "average weekly wages"—represents an average of earnings during the fifty-two weeks immediately preceding the injury, as determined under § 10 of the Act. *See Deweert v. Stevedoring Serv. of Am.*, 272 F.3d 1241, 1245 (9th Cir.2002). The second figure—the post-injury "wage-earning capacity"—is determined in accordance with § 8(h), by using the claimant's "actual earnings if such earnings fairly and reasonably represent his wage-earning capacity." 33 U.S.C. § 908(h). Upon deriving these two figures, § 8(c)(21) requires us to subtract the second from the first, and the

---

1. Section 8(c)(21) provides in full:
   In all other cases [of permanent partial] disability, the compensation shall be 66⅔ per centum of the difference between the average weekly wages of the employee and

   the employee's wage-earning capacity thereafter in the same employment or otherwise, payable during the continuance of partial disability.
   33 U.S.C. § 908(c)(21).

claimant is entitled to two-thirds of the difference. 33 U.S.C. § 908(c)(21).

## II.  Inflationary Adjustments

Johnston does not dispute the ALJ's calculation of his "average weekly wage." Rather, he challenges the use of his actual post-injury earnings for purposes of determining the second figure in the § 8(c)(21) formula—his residual "wage earning capacity." Johnston argues that without an adjustment for inflation between the time of his injury and his post-injury employment, use of his actual earnings does not accurately represent his lost earning capacity. Neither § 8(h) nor § 8(c)(21) of the Act provide support for making an inflationary adjustment under the circumstances presented by this case. Rather, such an adjustment is only necessary when the claimant's actual wages do not reasonably reflect his residual earning capacity or when there is no evidence of the post-injury job's wage rate at the time of injury.

### A.  Adjustments Under Section 8(h)

Under § 8(h), residual wage-earning capacity "shall be determined by [the claimant's] actual earnings." 33 U.S.C. § 908(h). However, this provision also grants the ALJ discretion to adjust this figure "as shall be reasonable" when actual earnings do not "fairly and reasonably represent[the claimant's] wage-earning capacity." *Id.* The ALJ found that Johnston's earning capacity was "most realistically

and fairly determined" by his actual earnings during his part-time employment subsequent to his injury. Specifically, in light of the factors that § 8(h) allows the ALJ to consider when determining whether an adjustment is appropriate, Johnston has not argued that "the nature of his injury, the degree of physical impairment, his usual employment, [or] any other factors or circumstances in the case which may affect his capacity to earn wages in his disabled condition" cast doubt as to whether his actual earnings accurately reflect his residual earning capacity. *Id.*[2]

As a consequence, the ALJ found no need to adjust the § 8(h) figure in this case because Johnston's actual earnings "fairly and reasonably represent[ed] his wage-earning capacity." Johnston does not really dispute this determination on appeal. Rather, while these earnings may represent the extent of his residual wage-earning capacity, Johnston argues that they cannot be fairly used to calculate his *lost* earning capacity when compared with his pre-injury earnings pursuant to § 8(c)(21).

### B.  Adjustments Under Section 8(c)(21)

■ After his injury, Johnston returned to his same job in 1995 at the same rate of pay he had earned in 1993. His wage rate remained constant despite what Johnston claims was a 5.89 percent inflation rate over this almost two-year period. Although Johnston may acknowledge that his

---

**2.** This provision provides:

The wage-earning capacity of an injured employee in cases of partial disability under subsection (c)(21) ... shall be determined by his actual earnings if such actual earnings fairly and reasonably represent his wage-earning capacity: *Provided, however,* that if the employee has no actual earnings or his actual earnings do not fairly and reasonably represent his wage-earning capacity, the deputy commissioner may, in

the interest of justice, fix such wage-earning capacity as shall be reasonable, having due regard to the nature of his injury, the degree of physical impairment, his usual employment, and any other factors or circumstances in the case which may affect his capacity to earn wages in his disabled condition, including the effect of disability as it may naturally extend into the future.

33  U.S.C. § 908(h).

actual, post-injury earnings accurately reflect his current earning capacity, he contends quite correctly that "a dollar earned between July 1995 and February 1996 is not worth as much as it was in November 1993." As a consequence, he argues that the post-injury earnings must be adjusted to account for inflation by virtue of the fact that they have less absolute "value" than they would have had at the time of injury. We do not agree. Johnston confuses earning capacity, as defined by statute, with spending power.

To begin, § 8(c)(21) simply states that "compensation shall be 66⅔ per centum of the difference between the average weekly wages of the employee and the employee's wage-earning capacity thereafter in the same employment or otherwise." 33 U.S.C. § 908(c)(21). Nothing in this provision suggests that we are required to take into consideration outside economic conditions, but, even if we were, we would decline to adjust for inflation in this case because such an adjustment is unnecessary. In fact, this is the perfect case—without any adjustment—for accurately assessing a claimant's lost earning capacity as a result of injury.

Here, Johnston returned to the exact same job at the same rate of pay that he had before his injury, the only difference being that his injury prevented him from working the same number of hours he had before. The formula accounts for his reduction in earning power as a result of part-time work. Consequently, when we follow the computation laid out by § 8(c)(21) and subtract Johnston's post-injury earnings from his pre-injury earnings, the difference represents an accurate

assessment of Johnston's lost earning capacity at the time of injury because the only variable that has changed is Johnston's ability to work due to injury. *See Rambo*, 515 U.S. at 298, 115 S.Ct. 2144 (compensation is provided "for wage-earning capacity lost *because of injury*" (emphasis added)).

Of course, there are occasions where a straightforward computation under § 8(c)(21) might not produce such an accurate assessment of lost earning capacity. One such instance is when factors external to the claimant's injury affect post-injury earnings, such as an increase in wages for reasons wholly independent of the individual claimant's injury. When the post-injury wage rate changes, the simple calculus of the § 8(c)(21) equation does not account for this additional, external variable, thus distorting the claimant's true loss of earning capacity as a result of injury. This occurs because the second figure in the equation, "wage earning capacity," is determined pursuant to § 8(h) which requires us to use the claimant's actual earnings. 33 U.S.C. § 908(h).[3]

As Johnston notes, the Benefits Review Board has addressed this imperfection by interpreting §§ 8(c)(21) and 8(h) as requiring that "wages earned in a post-injury job be adjusted to the wages that job paid at the time of the claimant's injury...." *Hundley v. Director, OWCP*, 32 BRBS 254, 259 (1998) (citations omitted). Thus, in *Hundley*, the Board affirmed the ALJ's calculation of the claimant's wage-earning capacity by using evidence of the wage rate for the claimant's post-injury jobs at the time of his injury rather than at the time of actual earnings. *Id.* Likewise, we

---

**3.** For example, if a claimant was earning $30 an hour for a 40–hour week before the injury, and returned to the same job after the injury at $40 an hour but, by virtue of the injury, was only capable of working part-time for 30

hours a week, a literal application of § 8(c)(21) would provide no compensation, despite the fact that the injury precludes the claimant from working at the same level of productivity as before the injury.

adopted this approach in *Sproull v. Director, OWCP*, 86 F.3d 895 (9th Cir.1996). In *Sproull*, we upheld the ALJ's determination that "Sproull's actual wages [were] not a fair and reasonable measure of his post-injury earning capacity because wage rates increased approximately fifteen percent after Sproull was injured." *Id.* at 898. Consequently, because the claimant's actual post-injury earnings did "not accurately project Sproull's loss of earning capacity because of an increase in wage rates," the ALJ's use of the rate at the time of injury was appropriate for purposes of calculating the claimant's compensation under the Act. *Id.* at 899.

*Sproull* and *Hundley* demonstrate that the touchstone of our inquiry for determining lost earning capacity under §§ 8(c)(21) and 8(h) is to discern the time-of-injury equivalent for the claimant's actual post-injury earnings. As those cases demonstrate, this attempt to isolate the true extent of lost earning capacity can be achieved by determining the wage rate at the time of injury. By using this wage rate to determine the claimant's residual wage-earning capacity rather than simply using the claimant's actual earnings, these cases demonstrate how an external factor such as wage fluctuation can be neutralized in order to more closely ascertain the claimant's lost earning capacity. Of course, in Johnston's case, we need not make this adjustment because his actual wage rate and the wage rate at the time of injury are the same.

Despite this distinction, Johnston urges us to consider another case, *Richardson v. Gen. Dynamics Corp.*, 23 BRBS 327 (1990), in which the Benefits Review Board addressed a situation where there was *no* evidence of the wage rate at the time of injury. There, the claimant, who had been a carpenter before his injury, engaged in a new occupation as a computer technician several years after his injury. Because "the actual wages paid at the time of injury in claimant's post-injury job [were] unknown," the Board determined that an inflationary adjustment to his actual earnings would be appropriate to more accurately reflect the time-of-injury equivalent. *Id.* at 331; *see also Hundley*, 32 BRBS 254, n. 7 (noting that inflationary adjustment to actual earnings is appropriate only when wage rate at time of injury is unknown). *Richardson*, like the Board's ruling in *Hundley* and our decision in *Sproull*, does not support Johnston's request to adjust for inflation because Johnston's wage rate at the time of injury is known.

Nevertheless, Johnston urges that an inflationary adjustment is appropriate, at least in cases such as his where the wage rate has not tracked inflation. He suggests that his "earning power on the open market" has decreased as a result of his occupation's stagnant wages. Whereas Johnston's co-workers may be able to compensate for this inadequacy by working overtime or supplementing their earnings by other moonlight occupation, Johnston argues that his injury limits his ability to compensate for this unrecoverable loss. However unrecoverable this "loss" may be, we agree with the Board that the fact that the wages Johnston earned in his post-injury job may not have tracked inflation is a circumstance attributable to a collective bargaining agreement that is wholly unrelated to his injury, and therefore cannot be accounted for under § 8(c)(21). As our decision in *Sproull* and the Board's rulings in the *Hundley* line of cases illustrate, adjustments to actual earnings in those cases were appropriate only in order to *exclude* consideration of external factors unrelated to injury when determining lost earning capacity. We decline Johnston's invitation to do the opposite by unneces-

sarily importing external factors such as inflation into the § 8(c)(21) analysis.

The petition for review is DENIED.