878 F.2d 380
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Kevin F. WALSH, Petitioner,
v.
NORFOLK DREDGING COMPANY, Director, Office of Workers'
Compensation Programs, United States Department of
Labor; Helmsman Management Services,
Inc., Respondents.
 No. 88-3532.
 United States Court of Appeals, Fourth Circuit.
 Argued Nov. 2, 1988.
Decided June 16, 1989.
 
 Ralph Rabinowitz (Rabinowitz, Rafal, Swartz & Gilbert, PC on brief) for petitioner.
 Ann Katherine Sullivan (Crenshaw, Ware & Johnson, Michael Scott Hertzig, Linda Meekins, Benefits Review Board, Lawrence W. Rogers, U.S. Department of Labor, Basil E. Voultsides, U.S. DOL/ESA/OWCP on brief) for respondents.
 Before PHILLIPS, Circuit Judge, BUTZNER, Senior Circuit Judge, and TERRENCE W. BOYLE, United States District Judge for the Eastern District of North Carolina, sitting by designation.
 PER CURIAM:
 
 
 1
 Kevin F. Walsh has petitioned for review of a final decision of the Benefits Review Board (the Board or BRB) denying in part his application for disability benefits under the Longshore and Harbor Workers' Compensation Act (LHWCA or the Act), 33 U.S.C. Sec. 901 et seq. The Board rejected an administrative law judge's determination that, inter alia, Walsh was entitled to continuing partial disability benefits for injuries attributable to a January 1982 on-the-job accident. Concluding that the ALJ's determination that Walsh was entitled to benefits for injuries sustained in the January 1982 accident was supported by substantial evidence, but that the ALJ did not give sufficient consideration to the relevant evidence of the resulting loss of earning capacity, we reverse and remand for further proceedings as to that portion of the award.
 
 
 2
 * At the time of the accident giving rise to this case, Norfolk employed Walsh as an overhead welder. On January 22, 1982, while Walsh was working on a tugboat, his foot slipped and his right arm became entangled in overhead equipment, dislocating his shoulder. Walsh was treated at and shortly thereafter released from the Chesapeake General Hospital.
 
 
 3
 On January 26, Walsh visited a general practitioner, Dr. Alfredo Soriano, who examined the shoulder and recommended that Walsh take three weeks leave from work. Walsh's supervisors apparently refused to approve any time off, however, and instead sent him to the company's orthopedic specialist, Dr. John Vann. Dr. Vann examined Walsh on February 1, and subsequently reported that he was "sure [Walsh] is going to be immobilized for about three weeks." J.A. at 114. Management nevertheless refused to grant Walsh's request for leave. Instead, Norfolk supervisors allowed him to wear a splint and agreed temporarily to restrict his duties to "light" work.
 
 
 4
 Walsh claims that, as a result of the accident, he was and continues to be incapable of performing "above eye-level" work with his right hand. He complained that his shoulder repeatedly "wiggled in and out," especially when he reached up and out with his right arm.
 
 
 5
 In the months immediately following the accident, Dr. Van and his associate, Dr. Stephen McCoy, continued to treat Walsh for the injury. Dr. Vann examined Walsh on April 26 and concluded that the injury was sufficiently healed that Walsh could perform all of his former duties. In May, however, Walsh again visited Dr. Vann and complained of repeated dislocations. Dr. Vann reevaluated his earlier diagnosis and scheduled corrective surgery, which Dr. McCoy performed on June 25.[1] This surgery apparently did not succeed, as hoped, in restoring mobility to the claimant's shoulder and arm. Beginning in January of 1983, Walsh began to see another orthopedic surgeon, Dr. A.A. Kirk, for treatment of the dislocation. After physical therapy resulted in little improvement of the claimant's impaired shoulder abduction, Dr. Kirk recommended additional surgery, which he performed sometime shortly after the initial September 1983 administrative hearing on Walsh's LHWCA claim.
 
 
 6
 The evidence of "lost earning capacity" allegedly attributable to the January 1982 accident consists primarily of Walsh's subsequent employment history.[2] On April 17, 1982, Norfolk discharged the claimant, purportedly for "excessive absenteeism." For a short period prior to his surgery the following June, Walsh worked as a carpenter, earning approximately $5.00 per hour. After the initial operation, however, he was not again employed until February of 1983,[3] when he finally obtained work as a gas station manager. The claimant held that position for six weeks, earning $3.45 per hour. Walsh then began working for a junk dealer, first at $150.00 and then later at $200.00 per week. Walsh continued to hold this position at the time of the 1983 administrative hearing.
 
 
 7
 On the basis of the available medical evidence, the ALJ concluded that Walsh had suffered a compensable partial disability as a result of the January 1982 accident. He recommended that the Department of Labor order Norfolk to pay Walsh continuing "temporary" disability benefits, which would presumably terminate upon any later showing that the claimant's condition had improved such that he could once again perform his former duties as an overhead welder.[4] On Norfolk's appeal, however, the Benefits Review Board reversed, concluding that, except with respect to the three-month period following Walsh's June 1982 surgery, the record did not include substantial evidence either that the claimant's impairments were directly attributable to his January 1982 on-the-job accident, or that he had suffered an actual loss of earning capacity in connection with the injury.
 
 
 8
 This petition for review followed.
 
 II
 
 9
 Our review of a BRB decision rejecting an ALJ's factual findings is to determine whether in doing so the BRB erred as a matter of law in concluding that those findings were not supported by substantial evidence. Essentially, that is, we review the ALJ's decision de novo under the same substantial evidence standard which bound the BRB. This of course means that in a situation of conflicting findings, we owe deference to the ALJ's findings rather than the BRB's. See Newport News Shipbuilding & Dry Dock Co. v. Director, OWCP, 681 F.2d 938, 941 (4th Cir.1982).
 
 
 10
 Reviewing under this standard, we conclude that the BRB erred in its assessment that substantial evidence did not support either the ALJ's finding that claimant's impairments were directly attributable to the January 1982 on-the-job accident or that claimant had suffered some actual loss of earning capacity from that injury. We conclude to the contrary that substantial evidence supported both the ALJ's finding of the requisite causation and some degree of compensable loss.
 
 
 11
 After examining the claimant in January of 1983, Dr. Kirk found that, notwithstanding the corrective surgery performed by Dr. McCoy the previous June, Walsh still "lacked eighty degrees abduction[,] seventy degrees external rotation and twenty degrees internal rotation of his [right] shoulder." J.A. at 115. The claimant also "lacked sixteen inches getting his hand up behind his back." Id. Dr. Kirk concluded that "[a]t the present time ..., Mr. Walsh has [a] fifty percent (50%) disability of his right shoulder." Id. at 111. By September, Walsh's shoulder mobility had improved considerably, but was still sufficiently impaired that Dr. Kirk recommended a second corrective surgical procedure. Id. at 116.
 
 
 12
 On various other occasions, Walsh's treating physicians diagnosed functional impairments directly attributable to the January 1982 accident. As early as April of 1982, for example, Dr. Vann had concluded that the claimant was "developing recurrent dislocation of his shoulder," possibly of such severity that Walsh would require corrective surgery. Id. at 113. On May 17, 1982, radiological examination confirmed an "anterior dislocation" and a consequent need for surgical repair of the claimant's shoulder joint. Id. at 112. At a deposition conducted after the initial administrative hearing, Dr. McCoy testified that Walsh required continuing treatment, including the initial surgery, as a result of "permanent instability of the shoulder." Id. at 182. Dr. McCoy had earlier concluded that this "instability" was directly traceable to the injuries Walsh suffered in the January 1982 accident. Id. at 108. Moreover, the claimant experienced continuing functional impairment--and therefore required additional surgery some twenty months after the accident--primarily as a result of complications associated with the first operation, hence as a proximate consequence of the original injury. Id. at 171.
 
 
 13
 We are persuaded, therefore, that the record contains substantial medical evidence to support the ALJ's conclusion that the claimant was partially disabled as a result of injuries suffered in the on-the-job accident here at issue. In so concluding, we are of course aware that there is substantial countervailing evidence. Norfolk claims, for example, that Walsh's continuing shoulder problems are attributable not to the January 1982 injury, but instead to a preexisting orthopedic condition traceable to earlier shoulder dislocations. The claimant's medical history indeed suggests that he injured his shoulder on more than one occasion before 1982, and Dr. McCoy at one point concluded that the evidence of these prior injuries "would seemingly remove the responsibility for this [recurring shoulder problem] from Norfolk Dredging Company." Id. at 107. After a further review of the claimant's medical records, however, Dr. McCoy reversed himself and indicated that "certainly the accident, when at work for Norfolk Dredging, was the cause for this boy's shoulder problems." Id. at 106. In any event, we think that on this causation question and the other factual issues present in this case Norfolk has shown no more than that the record might lead two equally reasonable factfinders to reach different conclusions on the ultimate question of liability. Under the applicable standard of review "it is immaterial that the facts may permit the drawing of different inferences, or even that we may have reached a different conclusion on the same facts." Symanowicz v. Army & Air Force Exchange Service, 672 F.2d 638, 642-43 (7th Cir.1982).
 
 
 14
 We therefore reverse the decision of the Benefits Review Board and reinstate the ALJ's original decision that Norfolk is liable to Walsh for temporary partial disability benefits under the LHWCA.
 
 III
 
 15
 We are also persuaded, however, that this case must be remanded for further consideration of the precise amount of benefits to be paid to the claimant.
 
 
 16
 The ALJ recommended that the Department compute Walsh's benefits on the basis of a $185 per week "loss of earning capacity." He arrived at that figure by subtracting the claimant's average post-injury wage rate (approximately $175.00 per week) from his "stipulated" earnings at Norfolk ($360.00 per week).
 
 
 17
 In cases involving "temporary partial disability [and] decrease of earning capacity," Sec. 908(e) of the Act provides for the payment of benefits totalling "two-thirds of the difference between the injured employee's average weekly wages before the injury and his wage-earning capacity after the injury in the same or another employment." 33 U.S.C. Sec. 908(e). Section 908(h) then sets out the factors to be considered by an ALJ in determining post-injury earning capacity.
 
 
 18
 The wage-earning capacity of an injured employee in cases of partial disability ... under [Sec. 908(e) ] shall be determined by his actual earnings if such actual earnings fairly and reasonably represent his wage-earning capacity: Provided, however, That if the employee has no actual earnings or his actual earnings do not fairly and reasonably represent his wage-earning capacity, the [factfinder] may, in the interest of justice, fix such wage-earning capacity as shall be reasonable, having due regard to the nature of his injury, the degree of physical impairment, his usual employment, and any other factors or circumstances in the case which may affect his capacity to earn wages in his disabled condition, including the effect of disability as it may naturally extend into the future. Id. Sec. 908(h). This provision establishes a two-step process for the determination of post-injury earning capacity. First, the ALJ must determine whether the claimant's actual post-injury wages accurately reflect actual wage-earning capacity. If not, the ALJ then must consider all relevant "factors and circumstances" and determine the claimant's actual capacity for various gainful employment.
 
 
 19
 This two-part statutory scheme does not, however, permit an administrative law judge to engage in cursory or conclusory analysis of whether actual post-injury wages accurately reflect wage-earning capacity. Read narrowly, Sec. 908(h) requires the ALJ to consider the specific "factors and circumstances" surrounding a claimant's "capacity to earn wages in his disabled condition" only after a preliminary finding that actual post-injury wages do not themselves fairly represent wage-earning potential. Put another way, "the second inquiry need not be reached depending on the outcome of the first." Randall v. Comfort Control, Inc., 725 F.2d 791, 797 (D.C.Cir.1984). This does not suggest, however, that Sec. 908(h) poses two separate and distinct questions, capable of analysis in isolation. Indeed, "the same factors must be considered at each level of the analysis." Id. (citing Devillier v. Nat'l Steel & Shipbuilding Co., 10 Ben.Rev.Bd.Serv. (MB) 649, 660-61 (1979)) (emphasis supplied). Moreover, "[w]hen an administrative law judge is setting forth in a Decision and Order his or her analysis of whether post-injury earnings fairly represent the claimant's wage-earning capacity ..., he or she [must] make explicit findings on all relevant aspects of the determination." Devillier, 10 Ben.Rev.Bd.Serv. (MB) at 661 (quoted in Randall, 725 F.2d at 797).
 
 
 20
 Here, the ALJ's otherwise exhaustive opinion includes no discussion whatsoever of the evidence informing his implicit conclusion that the claimant's average post-injury weekly wage rate accurately reflects true wage-earning capacity. Under Sec. 908(h), it simply is not the case, as the ALJ here assumed, that a comparison of pre- and post-injury wages always "afford[s] the court the necessary information to compute the lost earning capacity." J.A. at 197. The parties have joined issue on a number of questions implicating the legitimacy of this assumption, not the least of which is whether they indeed entered into a binding stipulation of Walsh's actual pre-injury wages as a Norfolk employee.[5] They dispute, for example, whether Walsh accurately reported his post-injury wages and employment history at the original administrative hearing, and whether he had the continuing capacity, notwithstanding his injury, to obtain higher paying positions than those which he actually held. Neither the Board nor the court of appeals is empowered to resolve such disputes without the benefit of explicit and detialed analysis of the relevant evidence by an administrative factfinder. We therefore remand the case to the Department of Labor for reconsideration and de novo determination both of Walsh's actual pre-injury wages and his diminished post-injury earning capacity. We emphasize that, on remand, the hearing officer should make explicit findings with respect to the various "factors and circumstances" which Sec. 908(h) clearly requires him to consider--even if it ultimately be determined once again that the claimant's proven post-injury wages accurately reflect his diminished earning capacity.
 
 IV
 
 21
 For the foregoing reasons, the decision of the Benefits Review Board is: (1) affirmed, insofar as it awards benefits for the period from June 2, 1982 to September 30, 1982; and (2) reversed, insofar as it absolves Norfolk of liability for the payment of disability benefits for other periods covered by the ALJ's initial Decision and Order. On the question of the claimant's compensable loss of earning capacity, the case is remanded to the Department of Labor for further proceedings consistent with this opinion.
 
 
 22
 SO ORDERED.
 
 
 
 [1]
 The parties do not dispute that, as a result of the surgery, Walsh was unable to work from June 25 until late September of 1982. The Benefits Review Board did not disturb the ALJ's finding that Walsh was entitled to disability benefits for this period
 
 
 [2]
 On appeal, the parties vigorously dispute the facts surrounding Walsh's post-injury employment history. Our summary incorporates only those facts upon which they appear to agree. For the reasons expressed in Part III, ante, we think that any remaining questions about the claimant's post-injury employment should be resolved on remand, in connection with a general de novo inquiry into his actual "loss of earning capacity."
 
 
 [3]
 Walsh claims that several prospective employers rejected his job applications because of his "manifest" shoulder problems
 
 
 [4]
 Though he explicitly found that Walsh's injury-related disability was "temporary," see J.A. at 197, the ALJ did not specifically address the question of whether Norfolk's obligation to pay "continuing benefits" might abate or terminate upon a later showing of substantial improvement in the claimant's condition. The Act makes clear, however, that benefits awards are subject to modification as a result of changes in relevant circumstances. See 33 U.S.C. Sec. 922. Of course, modification would be appropriate where the condition of a claimant originally found only "temporarily" or "partially" disabled had substantially worsened or improved. Haughton Elevator Co. v. Lewis, 572 F.2d 447, 449 (4th Cir.1978) (Sec. 922 authorizes Department of Labor to "decrease or increase" benefits awards in light of any relevant "change in conditions")
 
 
 [5]
 As indicated, the ALJ relied on a purported "stipulation" that Walsh's average pre-injury wage rate was $360.00 per week. Norfolk denies that the parties settled on any such stipulation, however, and the record on appeal indeed contains no evidence of explicit agreement on the point. Of course, we could do no better than guess at what understandings counsel for the parties might or might not have reached on this question off the record. We are persuaded, therefore, that the actual level of Walsh's pre-injury wages is best considered anew at the administrative level, in connection with the general inquiry on remand into the claimant's true loss of earning capacity