879 F.2d 901
 279 U.S.App.D.C. 55
 Mario LICOR, Petitioner,
v.
WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY and Director,
Office of Workmen's Compensation Programs, United
States Department of Labor, Respondents.
 No. 88-1663.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 23, 1988.
Decided July 14, 1989.
 
 Peter J. Vangsnes, with whom James F. Green, Washington, D.C., was on the brief, for petitioner.
 Jeffrey R. Miller, Washington, D.C., for respondents.
 Cornelius S. Donoghue, Jr., and Michael S. Hertzig, Attorneys, Dept. of Labor, Washington, D.C., also entered appearances, for respondents.
 
 
 1
 Before EDWARDS and RUTH BADER GINSBURG, Circuit Judges, and KAUFMAN*, Senior District Judge.
 
 
 2
 Opinion for the Court filed by Senior District Judge KAUFMAN.
 
 FRANK A. KAUFMAN, Senior District Judge:
 
 3
 Petitioner, a claimant under the Longshore and Harbor Workers' Compensation Act, as amended, 33 U.S.C. Sec. 901 et seq. (1982), and as extended to pre-July, 1982 injuries by the District of Columbia Workmen's Compensation Act of May 17, 1928, 36 D.C.Code Sec. 301 et seq., contends that the Benefits Review Board (the Board) committed reversible error in affirming a decision of the Administrative Law Judge (ALJ) that petitioner did not suffer any loss of earning capacity after December 26, 1980. Finding inadequate evidentiary support for the ALJ's conclusion that petitioner could earn $21,000 annually after that date, we vacate the Board's order and remand the case for further proceedings consistent with this opinion.
 
 I.
 
 4
 Petitioner, employed as a mechanic by the respondent, Washington Metropolitan Area Transit Authority (WMATA), injured his back in July, 1974, and reinjured it in January, 1977, in two work-related incidents. After the second incident and following hospitalization and other medical treatment, petitioner was deemed medically incapable of returning to his work as a mechanic, and was restricted as to his physical activities by his doctors. He received temporary total disability benefits from January, 1977 through August, 1978 and temporary partial disability benefits from August, 1978 through June, 1983.
 
 
 5
 In his claim which is the subject of this appeal, petitioner seeks temporary total disability benefits from January, 1977 until November, 1983 and permanent partial disability benefits thereafter. It was stipulated in the proceeding before the ALJ that petitioner's average weekly wage as of January, 1977 was $354.08. The ALJ concluded that petitioner had sustained a ten percent overall impairment and awarded temporary total disability benefits from January, 1977 through December, 1980. The ALJ also concluded that petitioner had a wage-earning capacity of $21,000 per annum or $403.85 per week as of December 26, 1980. Therefore, the ALJ determined that petitioner had not suffered any loss in his wage-earning capacity after that date and was not entitled to permanent disability benefits. In addition, the ALJ awarded petitioner attorney's fees in a lesser amount than sought.
 
 
 6
 In his appeal to the Board, petitioner contended that the ALJ committed error in determining that petitioner sustained no loss in his wage-earning capacity after December, 1980, and in reducing petitioner's attorney's fee reimbursement request. The Board affirmed the ALJ in all respects. In this appeal from the Board's decision pursuant to 33 U.S.C. Sec. 921(c), petitioner is pressing only his contention as to loss in his wage-earning capacity after December 26, 1980.
 
 II.
 
 7
 In Randall v. Comfort Control, Inc., 725 F.2d 791 (D.C.Cir.1984), Judge Wright wrote as follows concerning the provisions of the Longshoremen's and Harbor Workers' Compensation Act involved in this case:
 
 
 8
 The Act divides permanent partial disability cases into two groups, according to the type of injury. The first group, scheduled disabilities, are compensable at a specific rate regardless of their economic effect. See [33 U.S.C.] Sec. 908(c)(1)-(20). The second group, unscheduled disabilities, are only legally compensable if they lessen the worker's "wage-earning capacity." See id. Sec. 908(c)(21). Petitioner's claim clearly fits within this second category. Hence, his undisputed medical disability is compensable only to the extent that it adversely affects his wage-earning capacity.
 
 
 9
 The statute provides that, in calculating post-injury wage-earning capacity, actual post-injury wages shall be used if they "fairly and reasonably represent * * * wage-earning capacity"; but if they "do not fairly and reasonably represent * * * wage-earning capacity," the ALJ is authorized to,
 
 
 10
 in the interest of justice, fix such wage-earning capacity as shall be reasonable, having due regard to the nature of [the] injury, the degree of physical impairment, [the claimant's] usual employment, and any other factors or circumstances in the case which may affect [the claimant's] capacity to earn wages in his disabled condition, including the effect of disability as it may naturally extend into the future.
 
 
 11
 Id. Sec. 908(h). The ultimate objective of this wage-earning capacity formula is "to determine the wage that would have been paid in the open labor market under normal employment conditions to claimant as injured. * * * Only by the elimination of all variables except the injury itself can a reasonably accurate estimate be made of the impairment of earning capacity to be attributed to that injury." 2 A. LARSON, THE LAW OF WORKMEN'S COMPENSATION Sec. 57.21, at 10-101 to 10-102 (1982). The mere fact that post-injury wages are equal to, or in excess of, prior earnings is not determinative of the wage-earning capacity issue. However, the Benefits Review Board has held that "the burden of establishing that actual wages do not fairly and reasonably represent the claimant's earning capacity falls upon the claimant, not the employer." Hughes v. Litton Systems, Inc., 6 BEN.REV.BD.SERV. (MB) 301, 305 (1977).
 
 
 12
 ....
 
 
 13
 This court's role in reviewing decisions of the Benefits Review Board under the Longshoremen's and Harbor Workers' Compensation Act is limited. The decision of the ALJ must be upheld if it is supported by substantial evidence considered on the record as a whole and is otherwise in accordance with law. In performing this review function we must "conduct an independent review of the record to determine if the ALJ's findings are supported by substantial evidence." In addition, this court has held that in applying this standard of review "the beneficent purposes and humanitarian nature of the Act must be borne in mind," and that "doubtful questions, including factual ones * * *, must be resolved in favor of claimants." Hensley v. Washington Metropolitan Area Transit Authority, 655 F.2d 264, 267 (D.C.Cir.1981), cert. denied, 456 U.S. 904, 102 S.Ct. 1749, 72 L.Ed.2d 160 (1982).
 
 
 14
 725 F.2d at 794-95, 796 (footnotes omitted; certain citations omitted).
 
 III.
 
 15
 In this case, as in Randall, the key issue relates to lessening of wage-earning capacity. Petitioner contends that he had little or no lawful wage-earning capacity after January, 1977 and that his total lawful earnings since that date have resulted from short work stints for a car wash concern, and from employment as a supermarket clerk and as an aide to his brother. Petitioner also admits that he engaged after 1977 in several entrepreneurial and investment efforts.
 
 
 16
 The record discloses that in various loan applications, petitioner stated that he worked as a construction foreman from June, 1976 to November, 1978 earning $1000 a month, and at a car wash from June to August, 1978 at a rate of $100 a week. In another loan application, dated December 26, 1980, petitioner stated that he was self-employed as a tractor-trailer owner earning $21,000 a year. Petitioner testified before the ALJ that he lied in stating the $21,000 figure in order to obtain the loan for his minor daughter. Petitioner also notes that he was incarcerated for about ten months in 1979 and 1980 following a criminal conviction for driving a van full of marijuana and thus could not have earned at a rate of $21,000 per annum during those months.
 
 
 17
 Petitioner dealt in real estate and seemingly had the money to enable him and his family to live well, at least during some time periods after 1977. Petitioner, however, testified before the ALJ that his brother, whom he had previously aided, had helped him after his disabling back problems occurred, and that that, coupled with various odd jobs, enabled him and his family to live on such a level.
 
 
 18
 The ALJ had good cause to doubt, as he did, petitioner's credibility. But the ALJ indulged in what amounts, in the context of the record in this case, to little more than speculation in assuming that because petitioner admitted to driving vans or certain trucks, petitioner was employed as a tractor-trailer driver and earned $21,000 a year in so doing. While noting that WMATA's vocational expert estimated that a tractor-trailer driver would earn in the $15,000-$18,000 range per year, and that petitioner may well have driven a lesser-sized vehicle and earned less, the ALJ focused upon petitioner's general experience and the level of lifestyle of petitioner and his family and concluded that petitioner had told the truth in the December 26, 1980 loan application with respect to his earned income having been $21,000 per annum. Accordingly, the ALJ determined that petitioner's wage earning capacity after December 26, 1980 was greater than the stipulated per week amount of $354.08 referred to supra at p. 2, and that petitioner suffered no loss in wage-earning capacity after that date.
 
 IV.
 
 19
 "Wage-earning capacity," as those words are used in 33 U.S.C. Sec. 908(h), refers to income derived from labor, not from investments, such as ownership of a tractor-trailer. See 2 A. LARSON, THE LAW OF WORKMEN'S COMPENSATION Sec. 60.12(e), at 10-649 (1987). Therefore, the ALJ, in concluding that petitioner's post-1977 injury wage-earning capacity was $21,000, correctly excluded income from ownership of a tractor-trailer or any other truck, and differentiated such income from money petitioner earned as a driver of such vehicles. In that regard, the ALJ commented:
 
 
 20
 It is important to note that while ownership does not imply operation, it will in this case, especially in view of claimant's testimony that he drove his brother's garbage truck and can apparently perform this function. Actually, claimant could not have worked all of this time because a review of the record here shows he was incarcerated from October 3, 1979 until July 17, 1980, following a criminal conviction. However, even allowing for this period of incarceration, claimant had a period of nine months--five before he began serving a sentence and four afterwards--in which to establish himself as a truck driver. Additionally, since he stated he was self-employed, the employer is less able to verify claimant's employment. No Social Security earnings records or income tax returns are here. Actually, the occupation as 'tractor trailer driver' is not as important as the fact that claimant reported wages of $21,000 a year.
 
 
 21
 ALJ's Decision and Order at 11 (Feb. 1, 1985) (citations to record omitted). Those comments reflect appropriately the fact that "[t]he ultimate objective of [the] wage-earning capacity formula [established by statute] is 'to determine the wage that would have been paid in the open labor market under normal employment conditions to claimant as injured.' 2 A. LARSON, THE LAW OF WORKMEN'S COMPENSATION Sec. 57.21, at 10-101 to 10-102 (1982)." Randall, 725 F.2d at 795 (emphasis added).
 
 
 22
 In this case, there are overtones of possible illegal activity. The ALJ did not specifically deal with the question of whether petitioner was earning money from illegal activities in the post-injury period, other than in connection with the marijuana-hauling episode for which petitioner was incarcerated. However, in any event, illegal earnings hardly constitute income received "in the open labor market under normal employment conditions." In Randall, for example, Judge Wright focused on "the realities of the sheet metal trade" and concluded that jobs for "air balancing specialists in the Washington, D.C. area" were too few in number to permit pegging of the wage-earning capacity of Randall at the pay level available in such a position. Id. at 799. A fortiori, the possibility that a petitioner might earn illegal income would appear to provide an inappropriate base upon which to rest a finding of wage-earning capacity at a level far above what the record indicates petitioner was earning when injured or could earn as a driver of a vehicle considerably smaller than a tractor trailer,[1] or as a supermarket clerk, or as a car washer, or in a like capacity. In that regard, it is to be noted that section 908(h) provides that "actual post-injury wages" may, in some instances, "not fairly and reasonably represent ... wage-earning capacity." In this case, even if petitioner did in fact earn in the post-December, 1980 period at the rate of $21,000 per annum, such earnings would not appear to reflect his lawful post-injury wage-earning capacity.
 
 
 23
 It is not clear from the ALJ's decision whether he found that petitioner, after December, 1980, earned, or only had the capacity to earn, $21,000 per year. But, in any event, there is not sufficient evidence in the record to support either such finding, even taking into account petitioner's lifestyle, real estate and other dealings, and statements made by him in loan applications, and even eliminating any reliance upon petitioner's statements to his probation officer after his release from confinement in 1980 reflecting income at a level far below anything like $21,000 per annum. It should also be noted that a vocational expert testified before the ALJ that the type of job available in the Washington, D.C. area to a person with petitioner's background and post-injury physical condition paid in 1983 approximately $3.35 to $4.00 per hour--a dollar range which may require adjustment to reflect changes in wage rates between January, 1977 and 1983. Walker v. WMATA, 793 F.2d 319 (D.C.Cir.1986), cert. denied, 479 U.S. 1094, 107 S.Ct. 1308, 94 L.Ed.2d 162 (1987).
 
 
 24
 Accordingly, a remand is required in this case for the ALJ appropriately to determine petitioner's wage-earning capacity. In so doing, we can only recognize and emphasize Judge Wright's words in Randall:
 
 
 25
 In vacating the ALJ's decision and order, and remanding this matter for further proceedings, we recognize the onerous burden placed upon the ALJ by the Act. The Act requires omniscience. The ALJ must divine whether the claimant will suffer any injury-related reduction in wage-earning capacity at any time during his lifetime.
 
 
 26
 725 F.2d at 799. As in Randall, the ALJ, on remand, "must consider and make explicit findings on all relevant factors in the wage-earning capacity formula." Id.
 
 
 27
 Vacated and Remanded.
 
 
 
 *
 Of the United States District Court for the District of Maryland, sitting by designation pursuant to 28 U.S.C. 294(d)
 
 
 [1]
 The ALJ noted in his decision (at 11) that "[i]t is probable that claimant owned or drove something less than a tractor trailer truck."