41 F.3d 1555
 309 U.S.App.D.C. 400
 Robert L. BURNS, Petitioner,
v.
DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, Respondent.
GEORGE HYMAN CONSTRUCTION COMPANY, Petitioner,
v.
DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, Respondent.
 Nos. 93-1476, 93-1626.
 United States Court of Appeals,
 District of Columbia Circuit.
 Argued Nov. 14, 1994.
Decided Dec. 20, 1994.
Rehearing and Suggestion for
Rehearing In Banc
Denied Feb. 15, 1995.
 
 Marc Fiedler, Washington, DC, argued the cause and filed the brief for petitioner Robert L. Burns.
 Samuel K. Charnoff, Washington, DC, argued the cause for respondent/employer George Hyman Const. Co. Stewart S. Manela, Washington, DC, was on the brief for respondent/employer George Hyman Const. Co.
 Carol A. DeDeo, Associate Sol., U.S. Dept. of Labor, Washington, DC, entered an appearance for respondent Director, Office of Workers' Compensation Programs.
 Before WALD, SILBERMAN and RANDOLPH, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WALD.
 Concurring Opinion filed by Circuit Judge SILBERMAN.
 WALD, Circuit Judge:
 
 
 1
 Petitioner Robert L. Burns seeks review of three orders of the Benefits Review Board ("BRB" or "Board"). Burns contends that the Board exceeded its statutorily defined scope of review in reversing the first two Administrative Law Judge ("ALJ") rulings. We agree that the Board overstepped its authority, and find that the original ALJ award of benefits was supported by substantial evidence. We therefore grant Burns's petition for review, and reinstate the ALJ's original compensation order.
 
 I. BACKGROUND
 A. The Facts
 
 2
 In 1980, Burns was 68 years old, and employed by the Hyman Construction Company. He worked as a reinforcing rodman, positioning the steel rods that reinforce concrete floors and columns in office buildings and other structures. While working on the exposed top floor of a building one cold February morning, Burns ran out of materials and descended one level in search of more. He found what he needed in an area enclosed in plastic sheeting and heated by propane gas.[1]
 
 
 3
 When Burns entered the enclosed area, he became disoriented, and "had to get out." Burns believes that this was because the area was inundated with propane. After leaving the enclosure, Burns returned upstairs to rejoin the other workers. Minutes thereafter he experienced numbness in his left hand and arm, and difficulty in speaking. His co-workers summoned an ambulance to transport him to the George Washington University Hospital.
 
 
 4
 There Burns was diagnosed as having experienced a minor stroke.[2] An arteriogram revealed that he suffered approximately 90% "stenosis," or narrowing, of his right carotid artery, a major artery supplying blood to the brain. The stenosis resulted from the accretion of plaque[3] on the walls of Burns's artery, a process that occurs over a number of years. His doctors feared that a large clot might at any time break off the plaque and circulate to Burns's brain, causing a far more severe stroke. Burns underwent emergency surgery to excise the plaque. Afterward, he was hospitalized for nearly a month and endured a lengthy period of rehabilitation.
 
 
 5
 Burns asserted from the outset that exposure to propane gas on the job precipitated his stroke. Accordingly, in September 1981 he consulted with counsel as to his remedies. His attorney requested opinions from the physicians who cared for Burns following his stroke. One of these physicians, Dr. Teychenne, opined by letter that it was "quite possible" that Burns's exposure to propane gas "could have hastened the onset of the stroke." In November 1981, Burns filed a worker's compensation claim against Hyman under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. Sec. 901-50 (1988), extended by District of Columbia Workman's Compensation Act of 1928 ("DCWCA of 1928"). D.C.Code Secs. 36-501 to 36-503 (1973) (repealed 1982).[4]
 
 B. Procedural History
 
 6
 Because irregularities in the administrative process play a central role in our review of this case, a detailed description of the various ALJ and BRB proceedings is necessary.
 
 1. Round 1
 
 7
 In hearings held in December 1982 and January 1983, ALJ Phillip Lesser heard testimony from Burns, several of Burns's co-workers, two medical experts, and an industrial hygienist. The principal question before the ALJ was that of causation. Although it was undisputed that Burns's preexisting stenosis played a role in his stroke, "it is well settled that [under the LHWCA] an employer is liable for the consequences of a work-related condition which aggravates a preexisting condition." Director, Office of Workers' Compensation Programs v. Brandt Airflex Corp., 645 F.2d 1053, 1057 (D.C.Cir.1981).
 
 
 8
 Burns contends that breathing propane on the job precipitated his stroke. He testified before the ALJ that when he stepped into the heated enclosure, "[t]he gas hit [him]"; he became "disoriented" and "had to get out." He reported that while the ambulance attendants were escorting him downstairs, they remarked on an "awful odor of propane."[5] He introduced into evidence the attendants' logbook, which recorded that Burns had been "breathing propane gas."
 
 
 9
 George Hindle, the former president of Burns's union and himself a rodman for twenty-one years, testified that he had visited the site "[w]here Mr. Burns was working" on the day of his stroke, and noted a "particularly strong odor" of propane gas. Hindle explained that the odor got stronger "the closer you g[o]t to the tank[s]." On the other hand, James Owens, Burns's foreman at the time of his stroke, testified that the area Burns had entered was not entirely airtight; gaps in the plastic sheeting, as well as stairway and elevator shaft openings imperfectly sealed with plywood, provided a measure of ventilation.
 
 
 10
 The medical experts propounded two quite distinct theories of the origins of Burns's stroke. Hyman's expert, Dr. John Keshishian, suggested that a small piece ("embolus") might have broken off the pre-existing plaque partially blocking Burns's carotid artery. Keshishian theorized that such an embolus had travelled into one of the small blood vessels in Burns's brain, there obstructing the flow of vital oxygen-carrying red blood cells.
 
 
 11
 Dr. Richard Schwartz, Burns's expert, posited a different cause. He testified that propane is an "evacuant," a substance that displaces oxygen in the blood. He explained that the narrowing of Burns's carotid artery had greatly "reduc[ed] the amount of oxygen" flowing to Burns's brain and left him particularly "sensitive to any change in the oxygen" level in his blood. Schwartz opined that inhaling propane "would have [had] a deleterious effect" on Burns, "as opposed to the ordinary individual who has normal carotid arteries and could quite likely tolerate a reduction in oxygen [ ] carrying capacity without any problems." Schwartz concluded that the most likely explanation for Burns's stroke was that breathing propane had displaced some oxygen from his blood, and combined with the substantial blockage of Burns's carotid artery to produce a temporary "hypoxia," or lack of oxygen, in his brain.[6]
 
 
 12
 Schwartz found Keshishian's theory implausible because a cerebral embolism "develops ... like a bolt out of the blue," with no warning signs. The development of Burns's stroke, which involved an initial "disorientation," then numbness in his arm and face, and finally partial paralysis of his left arm and leg after he walked off the job site, was inconsistent with Keshishian's "embolism" theory. Schwartz also cited a recent study that found emboli to be an infrequent cause of strokes, accounting for only about 8% to 10% of incidents in the study group. The same study indicated, moreover, that in 100% of strokes that were triggered by emboli, the offending material broke off in the heart, not from the wall of an artery, as Keshishian hypothesized happened in Burns's case.
 
 
 13
 Conversely, Keshishian took issue with Schwartz's theory of what caused the stroke. Although he conceded that Burns could have been "starved" for oxygen if enough propane entered his blood stream, Keshishian doubted whether propane in a quantity sufficient to induce such a condition could be found on a job site. Keshishian opined that had enough propane been present to so affect Burns, the "whole damn place would blow up and if no one else got sick, it's pretty hard for me to accept such a situation."[7]
 
 
 14
 Finally, Hyman called Neal Jurinski, an industrial hygienist, to testify concerning a test he had performed to measure the level of propane at a construction site "similar" to that at which Burns's stroke occurred. Judge Lesser rejected the proffer as irrelevant, but permitted Jurinski to testify regarding the "chemistry of propane" and its "effect on the human body." Jurinski testified that the air an individual inhales must be 89% propane to have an "anesthetic" effect. He further testified that propane is explosive when mixed with air in quantities between 2.2% and 9.9%, but that in air containing above 9.9% propane "there is too much fuel present for the amount of available oxygen ... and so an explosion could not be propagated."
 
 
 15
 Judge Lesser indicated that he was "persuaded" by Schwartz's "hypoxia" theory of causation, rejected Keshishian's theory for essentially the reasons given by Schwartz, and awarded Burns benefits. In re Burns, Case No. 82-DCWC-708, OWCP No. 40-146508 (Nov. 30, 1984) ("ALJ I"), at 10-13. Hyman appealed to the BRB. The Board held that Judge Lesser had erred by failing to make "specific findings based on the conflicting evidence" regarding the quantity of propane gas in the enclosure Burns entered, because "the causation issue in this case [ ] turns on the existence of harmful amounts of propane gas at the worksite at the time of injury." Burns v. The George Hyman Construction Co., BRB No. 84-2754 (May 30, 1986) ("BRB I"), at 4. Specifically, the BRB instructed, Judge Lesser should have "consider[ed Jurinski's] ... testimony regarding the percentage of propane necessary in the atmosphere before the gas will have an anesthetic effect." Id. at 5. The Board remanded to Judge Lesser for reconsideration.
 
 2. Round 2
 
 16
 In his second opinion, Judge Lesser made a finding regarding the level of propane in the enclosure. He alluded to the BRB's own statement that:
 
 
 17
 employer's [ ] witnesses testified that the area into which claimant walked prior to his stroke contained propane heaters.... George Hindle, president of claimant's union, also testified to the smell of propane on the job site on the date of claimant's stroke. Further, the ambulance attendants who transported claimant to the hospital remarked about the smell of the propane gas.
 
 
 18
 He concluded: "I infer from all of the uncontradicted testimony that there was a heavy concentration of propane gas in the enclosure through which the Claimant walked." In re Burns, Case No. 82-DCWC-708, OWCP No. 40-146508 (March 9, 1987) ("ALJ II"), at 3.
 
 
 19
 Judge Lesser declined, however, to consider Jurinski's testimony regarding the amount of propane necessary to produce an "anesthetic effect." He explained that because his finding did not rely on such an effect, the testimony was irrelevant. Id. Indeed, Judge Lesser emphasized that "there was no suggestion made by any of the physicians ... that the Claimant was anesthetized as he walked through the enclosure." Id. He repeated that Schwartz's theory was that the inhalation of propane gas lowered the amount of available oxygen in Burns's blood, and combined with the blockage in Burns's artery to produce an insufficient oxygen supply ("hypoxia") in Burns's brain, causing the stroke. Judge Lesser also reiterated that he found Schwartz's testimony credible, and that Keshishian had conceded that Schwartz's theory was possible. Id.
 
 
 20
 On review, the BRB again reversed, criticizing Judge Lesser's decision not to consider the industrial hygienist's testimony regarding the amount of propane necessary to produce an "anesthetic effect." The BRB explained that, in its view, an "anesthetic effect" was the "underlying basis" for Schwartz's opinion; Judge Lesser had therefore erred by "accept[ing] Dr. Schwartz's theory without fully understanding it." Burns v. The George Hyman Construction Co., BRB No. 87-708 (May 29, 1987) ("BRB II"), at 4. The BRB also found that Judge Lesser had not complied with its instruction to make a "specific" finding regarding the level of propane in the enclosure. Id. The Board remanded for reconsideration of the "evidence relevant to causation in a manner consistent with this opinion." Id.
 
 3. Round 3
 
 21
 By the time of the BRB's second remand--six years after Burns's claim was filed--Judge Lesser had retired. The BRB assigned the case to a different ALJ, Judge Neusner. Both parties refused to participate in any further evidentiary hearing, and Judge Neusner granted their motion to file briefs in lieu of a new hearing.
 
 
 22
 Judge Neusner's decision, after repeating the positions of Doctors Schwartz and Keshishian, stated that "Claimant's problem of proof under the mandate on remand is that the Board does not find that the record supports [Schwartz's hypoxia theory]." In re Burns, Case No. 82-DCW-708, OWCP No. 40-146508 (Dec. 4, 1991) ("ALJ III"), at 12. He then wrote: "I agree with the Board that the record does not demonstrate that there was present at the time and place of exposure a sufficient concentration of propane gas to [result in the claimed 'hypoxia']."[8] Id.
 
 
 23
 Judge Neusner, however, interpreted the BRB's direction to consider the evidence on the "record as a whole" to require him to go beyond the propane concentration question, and determine whether Burns's stroke was job related in a broader sense. He found that Burns's job was physically demanding, particularly on the kind of winter day on which the stroke occurred. He then suggested that Burns's stroke may have been due to a modified version of Dr. Keshishian's "embolus" theory, whereby "the embolus was caused to break free by the body's reaction to various stresses of [Burns's] normal job related activity." On this ground, Judge Neusner again awarded Burns benefits. Id. at 14.
 
 
 24
 The BRB affirmed the part of Judge Neusner's order agreeing with the Board that the record did not demonstrate a concentration of propane sufficient to induce hypoxia. Burns v. The George Hyman Construction Co., BRB No. 92-0656 (Jul. 2, 1993) ("BRB III"), at 6. However, it reversed the ALJ's determination that the stroke could have been caused--even partially--by Burns's work-related stresses on the ground that Burns had never advanced that theory. Id. at 3-6. The Board entered a final order denying benefits, and Burns petitioned this court for review.
 
 II. DISCUSSION
 
 25
 A. Jurisdiction to Review the First Two BRB Orders
 
 
 26
 The LHWCA provides judicial review only for final orders of the BRB. 33 U.S.C. Sec. 921(c) (1988). At an earlier stage of Burns's case, this court held that the second Board decision remanding to the ALJ for further findings was not a final order and could not be appealed. Burns v. George Hyman Construction Co., No. 87-1261 (D.C.Cir. Oct. 27, 1987). A threshold question is therefore whether this court now has jurisdiction to review all three BRB orders, or only the third ("final") order.
 
 
 27
 The Administrative Procedure Act instructs that all three BRB opinions are now properly before us: "A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." 5 U.S.C. Sec. 704 (1988). Indeed, as a unanimous panel of the Fifth Circuit recently explained:
 
 
 28
 Even if this provision of the Administrative Procedure Act did not apply, logic and due process would require that this Court be able to review the decision to remand.... If this Court could not now review the decision to remand, the Board would be free to remand close cases until the ALJ produced an order that comported with the Board's view of the facts. The Board cannot usurp the fact-finding responsibility of the ALJ through its limited power of review.
 
 
 29
 Mijangos v. Avondale Shipyards, Inc., 948 F.2d 941, 944 (5th Cir.1991).[9]
 
 B. The Limited Scope of BRB Review
 
 30
 The LHWCA provision authorizing BRB review of ALJ rulings states, in pertinent part:
 
 
 31
 The findings of fact in the decision under review by the Board shall be conclusive if supported by substantial evidence in the record considered as a whole.
 
 
 32
 33 U.S.C. Sec. 921(b)(3) (1988). The scope of BRB review is also limited by regulation:
 
 
 33
 The Benefits Review Board is not empowered to engage in a de novo proceeding or unrestricted review of a case brought before it.... [The ALJ's] findings of fact and conclusions of law may be set aside only if they are not ... supported by substantial evidence ... or in accordance with law.
 
 
 34
 20 C.F.R. Sec. 802.301(a) (1994). We have often held that within this framework, it is the duty of the ALJ, not the BRB, to weigh the evidence and draw reasonable inferences therefrom. See, e.g., Whitmore v. AFIA Worldwide Ins., 837 F.2d 513, 515 (D.C.Cir.1988). The BRB has "no authority to second-guess the findings of the ALJ if those findings are supported by substantial evidence."[10] Director, Office of Workers' Compensation Programs v. Jaffe New York Decorating, 25 F.3d 1080, 1084 (D.C.Cir.1994). The BRB's scope of review under the LHWCA thus differs markedly from that of other agencies that are permitted to independently determine the facts and need not defer to the ALJ. See Presley v. Tinsley Maintenance Service, 529 F.2d 433, 436 (5th Cir.1976).
 
 
 35
 This court reviews decisions of the Board to ensure that it has not exceeded the proper scope of its review. To determine whether the BRB exceeded its statutory authority, we "conduct an independent review of the record to determine if the ALJ's findings are supported by substantial evidence." Licor v. Washington Metropolitan Area Transit Authority, 879 F.2d 901, 903 (D.C.Cir.1989) (quoting Randall v. Comfort Control, Inc., 725 F.2d 791, 796 (D.C.Cir.1984)). In so doing, we must keep in mind "the beneficent purposes and humanitarian nature of the Act" and resolve "doubtful questions, including factual ones ... in favor of the claimants." Id.
 
 C. The BRB Exceeded the Scope of Its Review
 
 36
 The BRB's review of Judge Lesser's rulings went well beyond determining whether his findings and conclusions were supported by substantial evidence. Because Judge Lesser's award of benefits was in fact so supported, the BRB was statutorily required to affirm it, and we need not reach the question whether the BRB erred in reviewing Judge Neusner's ruling.
 
 
 37
 1. The BRB Improperly Reinterpreted Dr. Schwartz's Testimony
 
 
 38
 Dr. Schwartz's testimony formed the basis of Judge Lesser's original order awarding benefits to Burns. The ALJ explained that he was "persuaded" by Dr. Schwartz's theory that "Claimant's inhalation of propane gas in combination with the [blockage] in his carotid artery caused a temporary hypoxia (low oxygen content) in the blood going to the Claimant's brain which caused his stroke." ALJ I, at 9-10. On review, the Board--seizing on Schwartz's additional observation that propane can have an "anesthetic" effect on humans--held that Judge Lesser had erred when he "did not consider [Jurinski's] ... testimony regarding the percentage of propane necessary in the atmosphere before the gas will have an anesthetic effect." BRB I, at 5.
 
 
 39
 On remand, Judge Lesser explained that Jurinski's testimony was "immaterial and irrelevant" because "[t]here was no suggestion made by ... any of the [ ] witnesses" that Burns had been "anesthetized." ALJ II, at 3. Judge Lesser repeated that on his understanding of Schwartz's testimony, Burns's stroke had resulted when his inhalation of propane had reduced the amount of available oxygen in the limited supply of blood that his substantially blocked carotid artery provided to his brain. Id.
 
 
 40
 The second BRB opinion flatly rejected Judge Lesser's interpretation of Schwartz's testimony. It maintained that the "underlying basis" for Dr. Schwartz's testimony was that "the propane had an anesthetic effect on [Burns]." BRB II, at 4. The Board therefore repeated that "the administrative law judge's failure to consider Dr. Jurinski's opinion as to the percentage of propane necessary to have an anesthetic effect was an abuse of discretion." Id.
 
 
 41
 The BRB's dialogue with Judge Lesser on this point bears little relation to the Board's statutory duty to ensure that the ALJ's findings and conclusions are supported by substantial evidence. Once Judge Lesser found that Burns's blood-oxygen level had been lowered by breathing propane, the BRB could not insist, based on its own review of Schwartz's testimony, that the ALJ had to find that Burns had either been "anesthetized" or left unaffected by the propane. Here, as in Crum v. General Adjustment Bureau, 738 F.2d 474, 480 (D.C.Cir.1984):
 
 
 42
 the Board failed to give [the ALJ's] determination its statutorily required conclusiveness, and instead redetermined the facts ... by focusing on [selected portions of the record]. But the BRB was not entitled to review this matter de novo; rather the Board was bound by the ALJ's determination if supported by substantial evidence.
 
 
 43
 Accord Newport News Shipbuilding & Dry Dock Co. v. Loxley, 934 F.2d 511, 514 (4th Cir.1991) (overruling the BRB's reversal of the ALJ on the ground that the Board's "independent analysis" of "evidence presented at the hearing" "erroneously expanded its scope of review"). In Burns's case, our "independent review of the record," Licor, 879 F.2d at 903, indicates that Judge Lesser's analysis of Schwartz's testimony was supported by substantial evidence.[11]
 
 
 44
 The Board's impermissible re-characterization of Schwartz's testimony fatally infected its review of Judge Lesser's rulings. The Board's belief that Lesser was obliged to make a "specific finding" regarding whether the air within the enclosure Burns entered was 89% propane--the quantity of propane that Jurinski testified would be necessary to produce an "anesthetic" effect--stemmed from its improper re-characterization of Schwartz's testimony. We cannot permit the Board thus to "usurp the fact-finding responsibility of the ALJ through its limited power of review." Mijangos, 948 F.2d at 944.
 
 
 45
 2. Judge Lesser's Award of Benefits Was Supported by Substantial Evidence
 
 
 46
 If the Board had accepted--as it was required to do--Judge Lesser's reasonable interpretation of Schwartz's testimony, the question before it would have been an altogether different one. Rather than asking that Judge Lesser make a finding regarding the 89% propane Jurinski thought necessary to "anesthetize" Burns, the Board should have considered whether Judge Lesser's conclusion that Burns's stroke resulted from "hypoxia" was supported by substantial evidence. We now address that question, and conclude that Judge Lesser's finding was so supported.
 
 
 47
 The record is clear that Burns suffered a stroke. Both medical experts testified that an insufficient supply of oxygen to the brain will result in an area of brain damage--a "stroke." The experts also agreed that Burns's left carotid artery was 90% blocked; the ALJ's finding that Burns was peculiarly vulnerable to a reduced blood-oxygen level thus cannot be questioned. Finally, there is ample evidence in the record from which Judge Lesser could conclude that inhaling propane displaces oxygen from the blood stream; Schwartz, whose testimony Judge Lesser credited, so testified, and even Keshishian acknowledged that an individual who breathed enough propane would be "starved" for oxygen.
 
 
 48
 The only legitimate issue in this case is therefore whether the ALJ's determination that Burns encountered a quantity of propane sufficient, in combination with his stenosis, to reduce the available oxygen in his blood to the point where he suffered an "hypoxia," was supported by substantial evidence. Assuredly, there is no way to determine with absolute certainty whether Burns's stroke was precipitated by a temporary lack of oxygen. It would be impossible to ascertain precisely how much oxygen would have to have been displaced to affect Burns, in his uniquely sensitive condition; there is, moreover, no way to determine whether the amount of propane necessary to displace that unknown quantity of oxygen was present in the air at the point Burns entered the enclosure. The level of propane in the enclosure simply was not measured at the time of Burns's stroke.[12]
 
 
 49
 The ALJ was not, however, required to make a "certain" determination of causation, but only one supported by substantial evidence. As is frequently the case under the "substantial evidence" standard, the evidence given before the ALJ would have permitted a finding in favor of either party.[13] Judge Lesser could have found that there was not enough propane in the enclosure to affect Burns, as Judge Neusner later did; record evidence indicating that the area was at least minimally ventilated, and Keshishian's opinion that it would take a large amount of propane in the air to have a deleterious effect on a human being, would have supported his decision. Instead, however, Judge Lesser found that there was a "heavy concentration" of propane, enough to precipitate Burns's stroke. For this finding, Judge Lesser relied on Burns's credited report of having been "hit" by a wave of propane gas, and the accounts of disinterested observers that the odor of propane was particularly strong that day in the area Burns entered. Either way, given the structure of the LHWCA, the BRB was required to uphold the finding of the ALJ. See Mijangos, 948 F.2d at 944 ("The facts of this case could support a finding in favor of either party. The choice between reasonable inferences is left to the ALJ and may not be disturbed if it is supported by [substantial] evidence.").
 
 D. Remedy
 
 50
 The LHWCA vests broad authority in the courts of appeals to "give a decree affirming, modifying, or setting aside, in whole or in part, [an] order of the Board and enforcing same to the extent that such order is affirmed or modified." 33 U.S.C. Sec. 921(c). This court has interpreted its statutory authority to extend, in cases where the BRB exceeds the scope of its review, to reversing BRB orders remanding to the ALJ and reinstating the original ALJ opinion. See Crum, 738 F.2d at 480; Jaffe, 25 F.3d at 1087.
 
 CONCLUSION
 
 51
 We find that the Board impermissibly examined the evidence independently and substituted its determinations for those of Judge Lesser, even though Lesser's findings were supported by substantial evidence. The final order of the BRB is therefore reversed with orders to reinstate Judge Lesser's original compensation order.
 
 
 52
 So ordered.
 
 SILBERMAN, Circuit Judge, concurring:
 
 53
 The BRB has three times reversed the ALJ's award of compensation to petitioner under the LHWCA as not supported by substantial evidence on the record as a whole. We hold that the BRB exceeded its scope of review the first two times because the Board must uphold the findings of fact by the ALJ if those findings are "supported by substantial evidence in the record considered as a whole." 33 U.S.C. Sec. 921(b)(3) (1988). In so doing, we follow the precedent of this circuit and of the other circuits which have considered the proper scope of judicial review of the BRB under 33 U.S.C. Sec. 921(c). See Randall v. Comfort Control, Inc., 725 F.2d 791, 796 (D.C.Cir.1984); Sun Shipbuilding & Dry Dock Co. v. McCabe, 593 F.2d 234, 237 (3d Cir.1979); Avondale Shipyards, Inc. v. Vinson, 623 F.2d 1117, 1119 n. 1 (5th Cir.1980). Under these cases, reviewing courts have looked independently at the record before the ALJ to determine if the ALJ's findings were supported by substantial evidence on the record as whole. This scope of review effectively removes the BRB from the hierarchy established to administer the workman's compensation programs.
 
 
 54
 Yet the BRB, a body with significant accumulated experience, competence and memory with the run of workman's compensation cases, found Judge Lesser's theory of causation of Burns' stroke not plausible. For us to be obliged to dismiss this judgment--essentially the product of superior institutional competence--out of hand appears anomalous. I am, however, uncertain whether any other course, any different scope of review, is even theoretically available to a court of appeals under this statute; review of the BRB's finding for substantial evidence is apparently foreclosed by the statutorily-dictated relationship between BRB and ALJ. See, e.g., Sun Shipbuilding, 593 F.2d at 237 & n. 1. If no other scope of review of the BRB than the present one is feasible, though, the statutory structure makes little sense to me.
 
 
 
 [1]
 In cold weather, construction companies commonly enclose sites where concrete has been poured and heat them with propane heaters, so that the concrete will cure rather than freeze. Naturally occurring propane is odorless, but propane used for heating has a strong "rotten egg" smell as a result of an odorant added for safety reasons
 
 
 [2]
 "Stroke" is a general term used to describe many kinds of trauma to the brain. Generally, however, the term denotes damage to the brain resulting from an inadequate supply of oxygen
 
 
 [3]
 "Plaque," in this context, consists of dead tissue, cholesterol, pieces of calcium, clotted blood, and other debris
 
 
 [4]
 The DCWCA of 1928 provided:
 [C]hapter 18 of title 33, U.S.Code, including all amendments that may hereafter be made thereto, shall apply in respect to the injury or death of an employee of an employer carrying on any employment in the District of Columbia ...; except that ... the term "employer" shall be held to mean every person carrying on any employment in the District of Columbia, and the term "employee" shall be held to mean every employee of any such person.
 D.C.Code Sec. 36-501 (1973).
 Effective July 24, 1982, the District of Columbia Workers' Compensation Act of 1979 ("DCWCA of 1979"), D.C.Code Secs. 36-301 to 36-345 (1993), superseded the LHWCA, as extended by the DCWCA of 1928. Because Burns's claim was filed before the effective date of the DCWCA of 1979, however, it is governed by the LHWCA.
 
 
 [5]
 Counsel for Hyman objected to Burns's report of the attendants' observation as hearsay, and the ALJ said he would disregard the "they said" part of Burns's statement. Burns made a similar statement on cross-examination, and Hyman's counsel again moved to strike Burns's report of what the attendants said as hearsay. This time, the ALJ overruled the motion. Id
 
 
 [6]
 Schwartz also mentioned that propane could have an "anesthetic" effect on humans. This remark has been a source of considerable confusion throughout Burns's case. In particular, Hyman and the BRB have consistently treated "hypoxia" and "anesthesia" as synonyms, when in fact they are very different concepts
 "Hypoxia" is a general term for a lack of oxygen--in the air, the blood, a tissue, the lungs, or anywhere in the body. See 2 J.E. SCHMIDT, ATTORNEY'S DICTIONARY OF MEDICINE AND WORD FINDER H-173 (1990) ("SCHMIDT").). Dr. Schwartz testified that Burns's stroke resulted from such a lack of oxygen in his brain.
 "Anesthesia," on the other hand, denotes a condition in which an individual experiences no feeling in the body as a whole (general anesthesia, which also involves loss of consciousness) or a part of the body (local anesthesia). See 1 SCHMIDT at A-206. Anesthesia is most commonly induced as a preliminary to surgical procedures by means of substances known as anesthetics, but may also result from disease or injury. Propane (C sub3 H sub8 ), like many other carbon/hydrogen compounds, can have a general anesthetic effect when inhaled in sufficient quantity. The precise mechanism by which general anesthetics suppress responses to sensory stimuli is ill understood, but they are thought to act directly on the central nervous system, including the brain, the spinal cord, and the peripheral nerves. General anesthesia does not involve depriving a patient of oxygen, and indeed, when anesthetics are administered as gases the breathing circuit is carefully monitored to ensure that oxygen delivery does not fall below 21% (the level of oxygen in the earth's atmosphere generally). See generally 3 ROSCOE N. GRAY, ATTORNEY'S TEXTBOOK OF MEDICINE Sec. 58.00-58.19 (3d ed. 1990).
 
 
 [7]
 Judge Lesser interjected that perhaps "no one else got sick" because "no one else ... [on the job site] had a plaque as large as [Burns's]" blocking his or her carotid artery. Keshishian appeared to agree that this fact might have explanatory power
 
 
 [8]
 Judge Neusner did not make any finding regarding the "concentration of propane gas" that would be necessary to produce the claimed hypoxia; nor did he make any "specific finding" regarding the quantity of propane in the enclosure
 
 
 [9]
 Burns's case is a particularly patent illustration of the problem envisioned by the Mijangos court. After the second BRB remand, Judge Neusner observed that "[c]laimant's problem of proof under the mandate on remand is that the Board does not find ... that there was present at the time and place of exposure a sufficient concentration of propane gas to [result in the claimed 'hypoxia']." ALJ III, at 12. Judge Neusner thus clearly felt constrained by the BRB's exercise of the fact-finding function to "agree" with the Board on this point. See id
 
 
 [10]
 "Substantial evidence" means more than a "scintilla," but less than a preponderance of the evidence. Whitmore, 837 F.2d at 515 n. 4
 
 
 [11]
 The BRB's view of Schwartz's testimony unduly emphasizes his reference to propane's anesthetic qualities. Judge Lesser held the evidence concerning an anesthetic effect "irrelevant," and indeed it is difficult to see how it could be otherwise--there is no issue in this case regarding Burns's capacity to feel pain
 Judge Lesser focused on propane's "evacuant" nature, or its tendency to replace oxygen in the blood. He found that when propane displaced some oxygen from the limited supply of blood that Burns's brain was receiving due to his stenosis, a lack of oxygen ("hypoxia") resulted and caused the stroke.
 
 
 [12]
 Lesser held that such a measurement could not be obtained by measuring a different site, because "the exact conditions that existed on the site on the date of the Claimant's injury, such as ambient temperature, wind speed and direction, size of enclosure, number of propane heaters, whether any of the propane heaters had blown out or were otherwise inoperative or leaking, and so forth," could not be duplicated." ALJ I, at 10. The BRB agreed. BRB I, at 5-6
 
 
 [13]
 Because substantial evidence is "something less than the weight of the evidence," the Supreme Court has observed that the "possibility of drawing two inconsistent conclusions from the evidence does not prevent an [ALJ's] finding from being supported by substantial evidence." Labor Board v. Nevada Consolidated Copper Corp., 316 U.S. 105, 106, 62 S.Ct. 960, 961, 86 L.Ed. 1305 (1942). Indeed, under the LHWCA, the BRB must accept an ALJ's finding even when it is not the more reasonable of two opposite inferences, as long as the finding is supported by substantial evidence. See, e.g., Hole v. Miami Shipyards Corp., 640 F.2d 769, 773 (5th Cir.1981); Newport News, 934 F.2d at 514